[No. S057063. Nov. 28, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL LEE ELLIOT, Defendant and Appellant.

## COUNSEL

Barry L. Morris, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Patrick J. Whalen, Julia Bancroft and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MORENO, J.**—Michael Lee Elliot was convicted in 1996 in Sacramento County Superior Court of the first degree murder (Pen. Code, § 187, subd. (a))[1] of Sherri Gandy. The jury also found defendant guilty of attempted robbery (§§ 211, 664) and found true two special circumstances, that the murder was committed during an attempted robbery (§ 190.2, subd. (a)(17)) and that the murder was intentional and involved torture (§ 190.2, subd. (a)(18)). The jury also found true allegations that defendant personally used a firearm (§ 12022.5, subd. (a)) and a knife (former § 12022, subd. (b) [now § 12022, subd. (b)(1)]) in the commission of the crimes. At the penalty phase, the jury determined that defendant should receive the death penalty. This appeal is automatic. We affirm the judgment in its entirety.

### I. STATEMENT OF FACTS

#### A. *Guilt Phase*

##### 1. *Prosecution Case*

###### a. *The Crime*

Sherri Gandy was killed at her workplace, the Black Stallion bar in Orangevale, California, between 2:00 a.m. and 3:00 a.m. on June 1, 1994. Gandy was the evening bartender at the Black Stallion. She worked the 6:00 p.m. to 2:00 a.m. shift, and was responsible for closing the establishment. The

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

Black Stallion was located in a strip mall. Its front door opened into a small vestibule, which led to a bar and seating area. A storeroom, with a safe mounted in its floor, was situated toward the back of the establishment. This safe was hidden from patrons' view, being located behind the door separating the bar area from the storeroom, and Gandy would place the receipts from her shift into the safe at the end of each work night. She did not know the combination to the safe, so the safe was left open for her and she would close and lock it at night after she made her deposit.

Several patrons who were at the Black Stallion during the evening of May 31, 1994, and the morning of June 1, 1994, testified at defendant's trial. Anthony Stewart, Gandy's boyfriend, arrived at the Black Stallion around 9:30 p.m. Stewart testified that defendant was at the bar when he arrived. Another patron, Scott Atkins, also arrived at the Black Stallion around 9:30 p.m. and saw defendant there. Atkins testified that defendant seemed friendly, but "not too sober." Stewart testified that although it appeared as if defendant had consumed "a lot" of alcohol, defendant seemed alert and had no difficulty walking or playing darts. At one point, defendant asked Gandy to take her shirt off, but Gandy did not respond.

Defendant made several trips in and out of the Black Stallion that night. Defendant left the Black Stallion sometime before midnight, leaving behind most of his beer, some money, and his sunglasses. Gandy put defendant's items in a cup which she placed on the bar's back counter. Defendant returned to the bar sometime later and requested a drink. Gandy was occupied and told defendant to wait. Defendant cursed and proceeded to leave. Gandy chased after defendant, apologized to him and said she would get him a drink. Gandy placed defendant's personal items in front of him along with his drink.

Another bar patron, Richard Donohue, overheard Gandy scolding defendant. Gandy told defendant, "Don't you do that any more or I'll have to take you over my knee and spank you." Without explanation, defendant asked Donohue if Donohue was going to hurt Gandy. Donohue testified that defendant seemed "awful nervous and jittery" and "very unstable."[2]

Defendant left the bar again not long thereafter. Defendant left behind some money and most of his drink. Gandy told defendant to take his personal items with him because she did not want to be responsible for them, but

---

[2] At some point that evening, Gandy told bar patrons, including defendant, that she was not concerned about violence because she carried a handgun on her at all times. Gandy did, in fact, keep a gun in her purse.

defendant said he would return. After he returned with some cigarettes a few minutes later, defendant walked to the back of the bar and pushed and pulled on a locked back door. Defendant saw a patron looking at him, stopped pushing the door and went into the men's bathroom. Defendant left the bar yet again shortly before it closed. Defendant again left behind his drink and some money.

Near closing time, Gandy told the three remaining patrons that she had to count out the day's receipts before closing the bar. When these patrons left, Gandy locked the door behind them. As Donohue exited, he observed that defendant had returned and was standing outside of his car in the strip mall's parking lot. Defendant told Donohue that he wanted to go inside the bar to collect his belongings. Donohue told him that he would have to return the next business day to gather them. On direct examination, Donohue testified that he thought defendant then drove away. On cross-examination, however, Donohue testified that he could not swear that defendant had left before he did.

After leaving the Black Stallion earlier that evening, Atkins had gone to his girlfriend's house approximately 100 yards up the street from the Black Stallion. While sitting outside of the house between 2:00 a.m. and either 2:30 a.m. or 2:40 a.m., Atkins heard a woman's screams. Atkins said that the screams were "blood curdling" and seemed to last for a long time.

Stewart also had left the Black Stallion before it closed, and was waiting at Gandy's house for her to return after she finished her shift. Gandy was supposed to return home at 2:15 a.m. When Gandy did not appear, Stewart returned to the Black Stallion to check on her. Stewart arrived at the Black Stallion shortly before 3:00 a.m. He found its front door unlocked and went inside. The bar was dark and appeared closed for the night. Stewart called for Gandy but received no response. Stewart noticed a light coming from the back storage area. When he attempted to open the door to this room, he discovered Gandy's dead body.

Police arriving at the scene pursuant to Stewart's 911 call found a key chain Gandy had used along with a set of keys on the ground outside the Black Stallion's entrance. One of the keys on the key chain was to the Black Stallion's front door. Just in front of the doorway was a bloody shoe print with a wavy pattern. Other bloody footprints led from the back storeroom toward the front door. There were no signs of a struggle in the main bar area.

Gandy's body lay in the back storeroom where the floor safe was located. The safe was closed and locked, and contained three bags of money. However, the lid that normally covered the floor safe had been removed. Black Stallion employees were supposed to keep this lid atop the safe, and the bartender who had worked the day shift at the Black Stallion on May 31 testified that she had placed the lid on top of the floor safe after putting her shift's receipts in the safe. Gandy's opened purse was also found on the storeroom's floor. Scattered about the storeroom floor were Gandy's identification and business cards, Gandy's checkbook, wallet, and many coins. No paper money was found. Sometime after the murder, one of the Black Stallion's owners discovered that a bag containing $155 in start-up money for the bar's morning shift was missing from the back of the establishment. Gandy had not known where this money was kept.

Dr. Robert Anthony, the forensic pathologist who performed Gandy's autopsy, determined that Gandy died from multiple stab and incision wounds. Gandy suffered at least 82 knife wounds to her body. She also had been shot four times in the head. The gunshots came either from the gun Gandy carried, or from one with similar characteristics. All but one of the knife wounds had been inflicted before Gandy's death. The gunshot wounds were postmortem, but Dr. Anthony testified that a layman would not necessarily have been able to determine whether Gandy was alive or dead at the time the shots were fired. Gandy also had small bruises and cuts on her hands, consistent with defensive wounds. Postmortem tests showed that Gandy had a 0.11 percent blood-alcohol level. There was no evidence that Gandy had been sexually assaulted.

The knife wounds were mainly, but not exclusively, to Gandy's head, neck, and torso. There were five wounds to the front of Gandy's neck, 22 to her chest, one postmortem wound to her abdomen, one wound to her thigh, 20 wounds in the region between the base of her skull and her upper back, 14 wounds to her arms, one wound to her side, one wound to her left cheek and 10 other wounds to her face, three wounds to her upper back, three wounds to her middle back, and one wound to her lower back. Of the knife wounds, only three could have caused death within a short period—slash wounds to her carotid artery and jugular vein, and a wound that pierced her chest wall and punctured her left lung. The other stab wounds did not involve any major organs.

The injuries to Gandy's neck included scratch-type wounds consistent with the tip of a knife having been dragged across her skin. Among the wounds to Gandy's face were superficial cuts to her left and right eyelids. The wound to

her upper right eyelid essentially severed the lid in half. The cuts to the eyelids did not damage Gandy's eyeballs. Other than the one postmortem wound, Dr. Anthony could not ascertain the order in which the knife wounds were inflicted, if Gandy was conscious during the infliction of all of the injuries, or how long it took to inflict all of the wounds.

The authorities never recovered any knife associated with the attack. Defendant owned a small Swiss army knife. Shortly before the killing, defendant informed a friend that his wife had recently bought him a filet knife and told Dorothy Williams, a friend of his wife's, that his wife had bought him a "really nice knife."

### b. *The Investigation*

Detectives Michael Bell and Kay Maulsby, investigating the case, learned from other Black Stallion patrons that defendant had been at the bar the previous evening and that he had worked at a local restaurant. The detectives visited defendant at his home on June 2, 1994. The detectives told defendant they were investigating a murder at the Black Stallion. Defendant acknowledged that he had been at the Black Stallion the night of the murder. Defendant said that he had visited the bar sometime during the evening, then returned at closing time to recover sunglasses and a hat that he had left there. Defendant said that he and another patron had left the bar at the same time, without incident.

The detectives asked defendant to return with them to the sheriff's department where they would continue to interview him. Defendant agreed and said he would follow the detectives to the station in a separate car. At first, defendant followed the detectives. But instead of going to the station with the detectives, defendant veered off their route and disappeared. Defendant would remain at large until June 10, 1994.

Defendant called his stepdaughter, Marcey Haugen, several times in the interval between the crime and his apprehension. Haugen testified that defendant asked her what his wife was saying to the police. Defendant asked Haugen why his wife "couldn't keep her mouth shut." Defendant also asked Haugen to get rid of some clothes in their backyard before anyone else found them. Haugen asked if the clothes were from the Black Stallion killing. Defendant said that they were not, and instead were from a knife fight in which he had been involved. Haugen did not disturb the clothes, but neither did she inform the police of their existence.

On June 6, 1994, defendant called Detective Bell twice. In the first call, defendant apologized for not following the detectives to the station. Defendant said he had fled because "I had—all I saw was—you got a—you got a[n] armed-robbery murder—you know." Defendant told Bell that he had visited the Black Stallion three times the night of the murder. The last time, he returned to the Black Stallion when another bar closed. Defendant said he saw Gandy closing the establishment, and left. At first, defendant recalled that he had gone directly home. Upon further questioning, defendant said that he had picked up a hitchhiker and taken him to a car wash. At the car wash, there had been an argument with two or three other men, but no one was hurt.

In defendant's second call to Detective Bell, made approximately three hours after the first, defendant said he was "rattin[g] on himself" and that he had been involved in a knife fight at the car wash. Defendant said that the hitchhiker he had picked up had argued with the men at the car wash, one of whom pulled out a knife and cut the hitchhiker under his arm. Defendant grabbed a fishing knife he kept in his trunk and cut the attacker on his arm. The other armed man then ran off and defendant attended to the hitchhiker's wounds. Neither defendant nor the hitchhiker wanted to notify the police, and defendant dropped the hitchhiker off and went home. At home, defendant told his wife what had happened. Defendant then went to a friend's house in South Sacramento, throwing the knife he had used in the fight off a bridge while en route.[3]

Prior to defendant's apprehension, the police received word that there might be some clothing buried in defendant's yard. Defendant's wife gave the police permission to conduct a search and informed officers that she had seen a partially buried pant leg while moving some wood on the side of the yard. Under the wood, officers discovered a pair of denim jeans wrapped around a T-shirt and a pair of shoes. Defendant's stepdaughter identified the shoes as belonging to defendant. Testing indicated that blood on the jeans and shoes could have come from either defendant or Gandy, who shared the same blood type. The treads on the shoes matched those of the bloody footprints found at the crime scene. A roll of nickels and a roll of dimes also were found in the yard. The Black Stallion's start-up money sometimes included rolls of coins.

Defendant was apprehended by a warrant fugitive detail in a vehicle stop on June 10, 1994. After defendant was detained, a search of the stopped car revealed a brown paper bag containing $29.50 in coins. At the time of his arrest, defendant had a number of minor scratches on his right arm, some bruising below his right armpit, and some minor scratches on his lower back.

---

[3] Defendant also called Arthur Robertson of the Sacramento Police Department on June 6. Defendant told Robertson that he had bloodstains on his clothing after assisting a man injured in a knife fight at a car wash. Defendant said that he had scared off the assailants with his own knife.

Later on June 10, 1994, defendant called his wife from an interview room at the sheriff's department. Their conversation was surreptitiously recorded. A tape of their discussion was introduced at trial. In the conversation, defendant apologized to his wife and told her, "This has been goin' on for a long time before I met you—a long, long, long time." When his wife asked, "How come I—you never told me nothing about or nothin'," defendant responded, "I don't know. I guess I never really thought it was anything and, well—I just—I get crazy. I don't—don't know just—uhhh." Defendant said, "One thing led to another and it just came out." Defendant also told his wife, "I'm in here for the rest of my life."

### 2. Defense Case

The defense presented no witnesses at the trial's guilt phase.

### B. Penalty Phase

### 1. Prosecution Evidence

At the penalty phase, the prosecution presented testimony in aggravation from four persons whom defendant had either robbed or attempted to rob in 1986 or 1987. Defendant had been convicted of these crimes on August 31, 1988.

Joseph Jacobs testified that on October 28, 1986, defendant emerged from a hiding place to rob him at gunpoint at a Carmichael, California bank while Jacobs sought to deposit the day's receipts from his pharmacy.

Paula Jean Door testified that defendant attempted to rob her at an automatic teller machine (ATM) on April 30, 1987. Defendant, lying on the ground underneath some bushes, pointed a gun at Door and demanded $200. Door, who was seven months pregnant at the time, returned to the ATM and deliberately punched the wrong code several times until she saw a car approach. She then pretended to faint. Defendant went back into the bushes but did not leave until two men arrived to give Door aid.

Cathy Allen testified that on July 28, 1987, defendant robbed her as she attempted to make a deposit at a local bank. Defendant yelled at Allen from bushes near the bank's night drop, demanding her money and her keys. Defendant made away with Allen's car and close to $1,200.

Calvin Ballard testified that on October 24, 1987, defendant accosted him as he attempted to make a night deposit at a bank. Defendant instructed Ballard to give him the night deposit bags. When Ballard hesitated, defendant

revealed a handgun. After Ballard gave defendant the money, defendant also demanded and received Ballard's car keys. Defendant could not start the car and ran away.

Marianne Bizallion, Gandy's mother, also testified at the penalty phase. Bizallion testified that Gandy had been her best friend and that Gandy loved being a mother to her son, who was 13 years old when she died. Bizallion read a short story by Gandy's son about his mother. Bizallion testified that she had tried to put makeup on Gandy so that people attending her funeral could see her face unveiled, but there was too much damage to Gandy's face for this to work.

### 2. *Defense Evidence*

Six witnesses testified on defendant's behalf at the penalty phase.

Thomas Lindow had been defendant's supervisor on the sanitation crew at the meat processing plant at Mule Creek State Prison during defendant's previous prison stint. Lindow described defendant as very cooperative and an exceptional worker. Lindow testified that defendant "seemed like he had a very good side to him" and that defendant was aware that he needed to control his addictions to alcohol and drugs.

Paul Valenzuela, another of defendant's supervisors at Mule Creek State Prison, thought defendant was a good worker and rated his performance as average or above average.

Ronald Park, defendant's former parole officer, testified that defendant was friendly and courteous and that he never had reason to suspect that defendant was engaged in any illegal activity.

James Esten, former program administrator for the California Department of Corrections, described defendant's likely placement in the California prison system if he were to be sentenced to life without parole, the security precautions taken at these prisons, and defendant's likely living conditions in prison.

Sister Maria Fitzgerald, a Catholic nun who, at defense counsel's request, had visited defendant in jail, testified that defendant seemed very remorseful of the Gandy crimes, and that from her visits she had found much to love about defendant.

The defense also presented an expert witness, Dr. William Vicary, who had interviewed defendant on four separate occasions for a total of 10 hours. Dr. Vicary also had performed two psychological tests on defendant to go along with a battery of tests performed by a clinical psychologist, and had reviewed police reports regarding defendant's past and present crimes, transcripts of police interviews with defendant and of defendant's jailhouse conversation with his wife, defendant's arrest records, the coroner's report, the preliminary hearing transcript, defendant's prior probation report, defendant's jail, prison, school, military, divorce, and medical records, and investigative reports summarizing interviews with defendant's family and acquaintances. In his testimony, Dr. Vicary recounted in varying detail what he had learned about defendant and his background from each of these sources. Dr. Vicary concluded that, in his opinion, defendant was manic-depressive and suffered from antisocial personality disorder, and that the "bottom line" was that defendant was "sick, very troubled and a very mixed-up guy."

Dr. Vicary also testified that defendant had given him two different accounts of the murder. In the first, defendant grabbed Gandy outside of the Black Stallion and forced her back inside. He demanded money. Gandy replied that the money was locked in the safe. Gandy grew frightened and started to resist. Defendant became enraged and stabbed her numerous times. Spotting Gandy's pistol, he then shot her to ensure she was dead.

In the second version, defendant arrived at the bar while Gandy was closing the establishment. Defendant asked if he could keep Gandy company, and she agreed. Inside the bar, defendant believed that Gandy was flirting with him. Defendant put his arms around Gandy and touched her breasts. Gandy objected, called him a pervert, and walked over to a phone to call the police. Defendant took the phone from her, at which time Gandy ran to the end of the bar and produced a gun from her purse. She pulled the trigger, but the gun did not fire. Defendant then grabbed Gandy, pulled out a knife, stabbed Gandy numerous times, loaded Gandy's gun, and shot her.

## II. Discussion

### A. Guilt Phase

#### 1. Insufficiency of Evidence

Defendant was charged with first degree murder and tried under three distinct theories of that crime—murder by torture, felony murder, and willful, deliberate, and premeditated murder. At trial, the defense conceded that defendant had killed Gandy, but argued that the slaying was not first degree murder. On appeal, defendant asserts that there was insufficient evidence to

sustain his conviction for first degree murder under any theory. Defendant also contends that the evidence failed to support either of the jury's findings as to the special circumstances. Defendant argues that his convictions thus violated his rights to due process of law and to a reliable penalty determination under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

### a. Standard of Review

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318 [61 L.Ed.2d 560, 99 S.Ct. 2781].) "In reviewing a criminal conviction challenged as lacking evidentiary support, ' "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' [Citation.] The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence [citation], and to special circumstance allegations [citation]. An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396 [133 Cal.Rptr.2d 561, 68 P.3d 1].)

### b. Torture Murder and Torture Special Circumstance

First, defendant contends that insufficient evidence supports his conviction for first degree murder under a murder-by-torture theory. Defendant asserts that little or no evidence aside from the condition of Gandy's body points toward a murder by torture, and he argues that Gandy's wounds, by themselves, do not provide sufficient evidence to support a conviction under this theory.

■ We begin our analysis by reviewing the elements of first degree murder by torture. Section 189 makes a murder perpetrated by means of torture a murder of the first degree. "Murder by torture 'is "murder committed with a wil[l]ful, deliberate and premeditated intent to inflict extreme and prolonged pain." ' [Citation.] 'The culpable intent is one to cause pain for " 'the purpose of revenge, extortion, persuasion or for any other sadistic purpose.' " ' [Citation.] There is no requirement that the victim be aware of

the pain. [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1207 [17 Cal.Rptr.3d 532, 95 P.3d 811].) " 'However, there must be a causal relationship between the torturous act and death, as Penal Code section 189 defines the crime as murder "by means of" torture. [Citation.]' [Citation.]" (*People v. Proctor* (1992) 4 Cal.4th 499, 530 [15 Cal.Rptr.2d 340, 842 P.2d 1100].)

"The finding of murder-by-torture encompasses the totality of the brutal acts and the circumstances which led to the victim's death." (*People v. Proctor, supra,* 4 Cal.4th at p. 530.) "[F]or purposes of proving murder by torture, the intent to inflict extreme pain 'may be inferred from the circumstances of the crime, the nature of the killing, and the condition of the victim's body.' [Citation.] But we also have 'cautioned against giving undue weight to the severity of the victim's wounds, as horrible wounds may be as consistent with a killing in the heat of passion, in an "explosion of violence," as with the intent to inflict cruel suffering.' [Citation.]" (*People v. Cole, supra,* 33 Cal.4th at pp. 1213–1214.)

Contrary to defendant's contentions, the record yields sufficient evidence to support defendant's conviction for first degree murder under a murder-by-torture theory. Beginning with the physical evidence, Gandy suffered 81 premortem stab and slash wounds. Only three of these wounds were potentially fatal. Some of these wounds suggest a meticulous, controlled approach. Among them, Gandy's right eyelids were split by a knife. Even though the eyelids were cut through, Gandy's eyeballs were unharmed. The nature of these wounds strongly implies the use of controlled force designed to torture. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1240 [278 Cal.Rptr. 640, 805 P.2d 899] [incision wounds on victim exhibiting a "nearly scientific air" provide "strong evidence" of a calculated intent to inflict pain].) The jury reasonably could have concluded that the stab and slash wounds to Gandy, including the wounds that ultimately proved fatal, constituted torture. (See *People v. Mincey* (1992) 2 Cal.4th 408, 433 [6 Cal.Rptr.2d 822, 827 P.2d 388] [the condition of a victim's body may create an inference of an intent to torture].)

Yet more evidence than just Gandy's wounds supported the prosecution's murder-by-torture theory. The evidence suggested that defendant may have tortured Gandy to coerce her into revealing the combination to the Black Stallion's floor safe. Defendant's repeated visits to the Black Stallion the night of the murder could be interpreted as surveying the establishment in advance of a robbery planned for later that evening. So too could defendant's rattling of the Black Stallion's rear door. A reasonable jury could have

construed defendant's leaving of his possessions at the bar as a pretext to gain admittance to the establishment once it had closed and the other patrons had left. The location of the keys found outside the Black Stallion's front entrance suggests that Gandy was accosted after leaving the bar, then forced back inside. Gandy's body was not found near the front of the bar, and indeed there were no signs of a struggle anywhere in the main bar area. Rather, she was found on the floor of a storeroom in the back of the bar. This storeroom also happened to contain the bar's floor safe. The floor safe's lid was not in place when officers arrived at the scene of the crime. A jury could have inferred from this evidence, taken together with Gandy's horrific wounds, that defendant tortured Gandy in the bar's back storeroom to coerce her into revealing the combination to the floor safe.

Defendant stresses that Dr. Anthony agreed with defense counsel's suggestion that the number and type of wounds Gandy suffered were consistent with a violent struggle. That a struggle may have occurred at some point during the assault, however, does not necessarily mean that all of Gandy's wounds were inflicted during a fight, and Dr. Anthony never expressly testified to that effect. Even more fundamentally, the fact that a struggle may have occurred is not inherently inconsistent with a murder by torture. Indeed, it would be expected that someone would resist being tortured, and put up a struggle. The existence *vel non* of evidence of a struggle is simply another circumstance for the trier of fact to consider in deciding whether a victim was tortured. Here, even assuming a struggle took place, the evidence provided a sufficient basis for a torture-murder conviction.[4]

Finally, defendant missteps in arguing that an alleged dearth of evidence indicating how long Gandy suffered refutes the prosecution's torture-murder theory. Defendant notes that although Atkins heard screams lasting a "long time," Dr. Anthony could not estimate how long it took defendant to inflict the knife wounds on Gandy. Yet the question of how long Gandy actually

---

[4] Defendant also emphasizes the lack of evidence indicating Gandy was bound and unable to resist during the attack. (Cf. *People v. Bemore* (2000) 22 Cal.4th 809, 820, 842 [94 Cal.Rptr.2d 840, 996 P.2d 1152] [binding of victim suggested that victim was tortured]; *People v. Crittenden* (1994) 9 Cal.4th 83, 141 [36 Cal.Rptr.2d 474, 885 P.2d 887] [same]; *People v. Proctor, supra,* 4 Cal.4th at p. 530 [same].) We have never held that a failure to bind or gag a victim necessarily precludes a finding that the victim was tortured. (See, e.g., *People v. Davenport* (1985) 41 Cal.3d 247, 258 [221 Cal.Rptr. 794, 710 P.2d 861] [recitation of torture victim's injuries incorporates no indication that victim was bound or gagged].) On the contrary, as stated *ante,* "[t]he finding of murder-by-torture encompasses the totality of the brutal acts and the circumstances which led to the victim's death" (*People v. Proctor, supra,* 4 Cal.4th at p. 530), meaning that evidence that the victim was or was not restrained is merely another consideration for the finder of fact to take into account in determining whether a defendant committed murder by torture. Here, as discussed, the nature of Gandy's wounds and the circumstances surrounding the killing provide sufficient support for a conviction premised on a torture-murder theory.

suffered pain is ultimately not a pivotal issue. "[M]urder by means of torture under section 189 is murder committed with a wil[l]ful, deliberate, and premeditated *intent* to inflict extreme and prolonged pain." (*People v. Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665], italics added.) Notwithstanding defendant's attempt to conflate the two, the defendant's *intent* to inflict prolonged pain is not the same as the victim's *suffering* of prolonged pain. Indeed, a defendant may be found guilty of murder by torture even if the victim is never aware of any pain. (*People v. Cole, supra,* 33 Cal.4th at p. 1207; *People v. Pensinger, supra,* 52 Cal.3d at p. 1239; *People v. Wiley* (1976) 18 Cal.3d 162, 173 [133 Cal.Rptr. 135, 554 P.2d 881].) The evidence here supports the conclusion that defendant intended to inflict extreme and prolonged pain; that is enough.

We also conclude that the evidence sufficed to sustain the true finding as to the torture-murder special circumstance. To find the torture-murder special circumstance true, the jury had to find that "[t]he murder was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18).) The nature of Gandy's wounds and the circumstances surrounding the killing adequately support the conclusions that defendant intended to kill Gandy and that the murder involved torture.

### c. Felony Murder and Attempted-robbery-murder Special Circumstance

Defendant also argues that the evidence does not support his conviction for first degree murder under a felony-murder theory or the true finding as to the attempted-robbery-murder special circumstance.

" ' "[A]ll murder . . . which is committed in the perpetration of, or attempt to perpetrate," certain enumerated felonies, including [robbery], "is murder of the first degree . . . ." (Pen. Code, § 189.)' " (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1140 [124 Cal.Rptr.2d 373, 52 P.3d 572].) " 'We have required as part of the felony-murder doctrine that the jury find the perpetrator had the specific intent to commit one of the enumerated felonies [in section 189]. [Citations.]' [Citation.] It also is established that the killing need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing. [Citations.]" (*People v. Proctor, supra,* 4 Cal.4th at p. 532.) Circumstantial evidence may provide sufficient support for a felony-murder conviction. (See, e.g., *People v. Marks* (2003) 31 Cal.4th 197, 230–231 [2 Cal.Rptr.3d 252, 72 P.3d 1222] [sufficient evidence supported robbery-murder conviction based on evidence that victim usually carried several $1 bills, no paper currency was found on victim or in his taxi, and defendant had seven $1 bills on his person at the time of his arrest].)

The victim here was found, stabbed and slashed repeatedly, next to a floor safe hidden in the back room of a bar. The contents of her purse were strewn about the floor. The attack occurred after the bar had closed and other patrons had left. The lid to the bar's floor safe was not in place. A reasonable jury could have interpreted defendant's conduct throughout the night leading up to the murder as evincing a plan to gain entry into the bar after it closed, and then rob the bartender of the day's receipts. The jury also could have concluded from the evidence presented that defendant ambushed Gandy after she closed the bar, forced her at knifepoint into the back room, and then inflicted fatal wounds as part of the attempted robbery. The evidence therefore provides sufficient grounding for the prosecution's felony-murder theory premised on an attempted robbery.

Defendant argues at length that the trial evidence might be reconciled with various scenarios not involving an armed robbery. Even if this were so, " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]' " ' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 368 [110 Cal.Rptr.2d 272, 28 P.3d 34].) As reviewed *ante*, sufficient evidence supports a conviction for felony murder, and the viability of alternate theories provides no basis for reversing the judgment.

We also conclude that the evidence suffices to support the jury's true finding as to the attempted-robbery-murder special circumstance. (See, e.g., *People v. Valdez* (2004) 32 Cal.4th 73, 105–106 [8 Cal.Rptr.3d 271, 82 P.3d 296]; *People v. Proctor*, *supra*, 4 Cal.4th at pp. 535–536.)[5]

### d. *Willful, Deliberate, and Premeditated Murder*

Defendant also challenges the sufficiency of the evidence as to the third theory of first degree murder advanced by the prosecution, namely that defendant committed willful, deliberate, and premeditated murder.

■ "Generally, there are three categories of evidence that are sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method. [Citations.] When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citation.] But these categories of evidence, borrowed from *People v.*

---

[5] Although defendant does not expressly challenge the sufficiency of the evidence underlying his conviction for attempted robbery, to the extent that his arguments implicitly subsume such an attack we conclude that there was more than adequate evidence to support his conviction for this crime, as well.

*Anderson* (1968) 70 Cal.2d 15, 26–27 [73 Cal.Rptr. 550, 447 P.2d 942], 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' [Citation.]" (*People v. Cole, supra,* 33 Cal.4th at p. 1224.)

Applying the *Anderson* factors and reviewing the facts adduced at trial in the light most favorable to the People (*People v. Marks, supra,* 31 Cal.4th at p. 230), we conclude that the record yields sufficient evidence to support the verdict under a theory of willful, deliberate, and premeditated murder. With regard to planning, a reasonable jury could infer that defendant armed himself with a knife prior to accosting Gandy outside of the bar. Defendant told others shortly before the killing that he had a new knife, and a knife kept in defendant's trunk featured prominently in the stories defendant told to the police in the days following the killing. That defendant armed himself prior to the attack "supports the inference that he planned a violent encounter." (*Ibid.*) Furthermore, "the total vulnerability of the victim and the evidence of a previously selected remote spot for the killing do suggest planning." (*People v. Pensinger, supra,* 52 Cal.3d at p. 1237.) As discussed, a reasonable jury could have interpreted defendant's actions earlier during the evening of the murder as surveying the Black Stallion for a later attack. Defendant waylaid and killed Gandy after the Black Stallion closed for the night and all other customers had left. The fatal wounds were inflicted in a back storeroom well removed from the bar's front entrance. Taken collectively, the record evidence supports a finding of planning.

The jury could have construed the evidence as establishing a motive, such as that defendant deliberately intended to kill Gandy to eliminate her as a witness to the attempted robbery and torture. (See *People v. Proctor, supra,* 4 Cal.4th at p. 529.) The method of killing here also suggests premeditation. (See *People v. Memro* (1995) 11 Cal.4th 786, 863–864 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Gandy suffered three potentially lethal knife wounds, not to mention almost 80 other stab and slash wounds to her body. The jury could have construed the repeated slashing of Gandy's throat, in connection with the dozens of other wounds, as intimating a preconceived design to kill. We also observe that defendant shot Gandy in the head four times from a few feet away. Even though these wounds were inflicted after Gandy was clinically dead, Dr. Anthony testified that when the shots were fired a layman would not necessarily know that Gandy had already died. A reasonable jury could have construed these shots as an ultimately unnecessary coup de grâce to a fatal attack effected with a calculated design to kill.

In sum, we find that a reasonable jury could have returned a guilty verdict on a willful, deliberate, and premeditated killing theory of first degree murder, as well as on the other theories of first degree murder offered to it. Sufficient evidence also supports the torture-murder and felony-murder special circumstances. We therefore reject defendant's various challenges to the sufficiency of the evidence.

## 2. *Admission of Evidence*

Next, defendant contends that the court should have sua sponte excluded certain guilt phase testimony by Dorothy Williams, a friend of defendant's wife. Williams testified, in pertinent part, that a few days before the murder she had seen defendant watching a film that depicted women being stabbed and cut. Defendant contends that Williams's testimony constituted inadmissible character evidence that tainted the verdict and violated his right to due process of law and to a reliable penalty determination under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

Called near the close of the prosecution's case, Williams testified that during a visit to defendant's house shortly before the killing, she observed defendant watch a violent, "very gory X-rated" videotape depicting the "stabbing, cutting up [of] a woman." When Williams objected to the video, defendant said that she and his wife, who also was present at the time, were "lightweights" who "couldn't handle[]" the movie. The prosecutor referenced this testimony in her closing statement, arguing that the jury should find the torture special circumstance allegation true because, among other reasons, "we know the last week in May that the defendant had watched that movie . . . that was a very gory X-rated type of cut them up film with women being cut up . . . ."

No objection was made to Williams's testimony regarding the videotape.[6] We therefore reject as forfeited defendant's arguments on appeal challenging the admission of this evidence. (Evid. Code, § 353; *People v. Champion* (1995) 9 Cal.4th 879, 918 [39 Cal.Rptr.2d 547, 891 P.2d 93].)

---

[6] Defense counsel objected to an instruction proposed by the trial court at the penalty phase that would have directed the jury, "Evidence was presented in the guilt phase for the purpose of showing the defendant used a videotape depicting violent assaults against women. . . . [¶] You may consider the evidence described in the instruction for whatever bearing, if any, it may have on the circumstances surrounding the commission of the crimes of which the defendant was convicted in the guilt phase of this trial. You may not consider it as evidence of bad character." Upon defense counsel's objection, the court did not give this instruction.

For argument's sake, even if we were to assume that defendant properly preserved this claim and further assume that allowing the testimony was error, we would find the mistake harmless. (See *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Williams's testimony established only that defendant watched a violent film with content vaguely similar to the circumstances of the murder, and that he had a gruff response to Williams's objection. On cross-examination, Williams admitted that she could not tell whether the movie was of a type that, "for good or bad," could have been obtained at a videotape rental store. Moreover, Williams's testimony was a minor part of the prosecution's case, and the jury already had ample evidence before it establishing defendant's guilt of the crimes charged. We find it inconceivable that the result here might have been affected in any respect by Williams's brief testimony regarding the videotape.[7]

### 3. *Alleged Instructional Errors*

#### a. *Postmortem Gunshot Wounds*

Defendant also contends that the trial court erred in refusing to instruct the jury not to consider Gandy's gunshot wounds in determining whether she had been tortured.[8] Defendant argues that without this instruction, the jury may have believed that the postmortem gunshot wounds themselves constituted torture. The failure to instruct, defendant argues, violated his rights to due process of law and to a reliable penalty determination under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

We do not believe the jury was misled. The court instructed the jury that to be guilty of murder by torture, defendant must have had a "willful, deliberate and premeditated intent to inflict extreme and prolonged pain upon a living human being for the purpose of revenge, extortion, persuasion, or any sadistic purpose," and that "[t]he acts or actions taken by the perpetrator to inflict extreme and prolonged pain [must have been] the cause of the victim's death." With regard to the torture-murder special circumstance, the jury was instructed that to find the circumstance true, it must conclude that defendant intended to kill a human being, that "defendant intended to inflict extreme

---

[7] Our conclusion obviates the need to respond to defendant's argument that because the testimony in question assertedly "had an unfair prejudicial impact on the jury's deliberations" (*United States v. Young* (1985) 470 U.S. 1, 17, fn. 14 [84 L.Ed.2d 1, 105 S.Ct. 1038]), his claim on appeal was not forfeited by the absence of an objection.

[8] The proposed instruction provided, "In deciding whether the injuries inflicted on the victim constituted torture, you must consider only the injuries inflicted upon her while she was alive. You must not consider the post-mortem gunshot wounds when determining whether or not she was tortured."

cruel physical pain and suffering upon a living human being for the purpose of extortion or persuasion or for any sadistic purpose," and that "[t]he defendant did in fact inflict extreme cruel physical pain and suffering upon a living human being no matter how long its duration." Following these instructions, as it is presumed to have done, the jury would not have considered the postmortem gunshot wounds as themselves constituting torture, since those wounds were not to a "living human being" and were not the cause of Gandy's death. (See *People v. St. Joseph* (1990) 226 Cal.App.3d 289, 296–297 [276 Cal.Rptr. 498], italics omitted.)

In addition, to the extent that defendant's proposed instruction would have prohibited the jury from considering anything *other than* Gandy's premortem wounds in deciding whether Gandy had been tortured, the instruction misstated the law and was properly refused. (See *People v. Mickey* (1991) 54 Cal.3d 612, 697 [286 Cal.Rptr. 801, 818 P.2d 84].) Defendant's proposed instruction misstated the law because "[i]n determining whether a murder was committed with that intent [to torture], the jury may of course consider all the circumstances surrounding the killing." (*People v. Steger, supra,* 16 Cal.3d at p. 546.) Consistent with this general rule, acts following the alleged torture can shed light on a defendant's earlier intent. (See, e.g., *People v. Cole, supra,* 33 Cal.4th at p. 1214 [finding defendant's statements following an attack on his wife to be probative of an intent to torture].) The trial judge, therefore, did not err in declining to give defendant's proposed instruction on this subject.

### b. *Failure to Instruct on Lesser Included Offense*

The jury was instructed as to the elements of murder, that murder was classified into two degrees, and that if it determined defendant had murdered Gandy, but had a reasonable doubt as to whether the murder was of the first or second degree, it had to give the defendant the benefit of the doubt and return a verdict fixing the murder as being of the second degree. The verdict forms provided to the jury included a space in which the jury could return a second degree murder verdict.

The trial court gave no other instructions expressly explaining the crime of second degree murder, besides those related *ante.* Defendant argues that the failure to provide additional instructions detailing the elements of second degree murder was the "functional equivalent of no instruction at all" regarding this offense. Defendant contends that the failure to provide additional guidance to the jury on this subject violated his rights to due process of law, to trial by jury, and to a reliable penalty determination under the

California Constitution and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Cf. *Beck v. Alabama* (1980) 447 U.S. 625, 637 [65 L.Ed.2d 392, 100 S.Ct. 2382].)

██ " '[A] defendant has a constitutional right to have the jury determine every material issue presented by the evidence [and] . . . an erroneous failure to instruct on a lesser included offense constitutes a denial of that right . . . .' [Citation.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 645 [106 Cal.Rptr.2d 629, 22 P.3d 392].) However, we need not reach the issues of whether defendant was entitled to a second degree murder instruction in the first instance, or whether the trial court's instructions regarding second degree murder were deficient, because we conclude that any assumed instructional error on this score was harmless beyond a reasonable doubt. (See *Chapman v. California, supra,* 386 U.S. at p. 24.)

██ " '[I]n some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury.' [Citations.]" (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1028 [254 Cal.Rptr. 586, 766 P.2d 1]; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1086–1087 [119 Cal.Rptr.2d 859, 46 P.3d 335] [failure to instruct as to manslaughter harmless given jury's true finding as to felony-murder special circumstance]; *People v. Price* (1991) 1 Cal.4th 324, 464 [3 Cal.Rptr.2d 106, 821 P.2d 610] [same].)

Here, the jury found defendant guilty of first degree murder and attempted robbery, and found true both the torture-murder and the attempted-robbery-murder special circumstances. To have convicted defendant of first degree murder under a felony-murder theory here, the jury had to have found beyond a reasonable doubt that defendant had killed Gandy in an attempt to perpetrate a robbery. (§ 189; *People v. Cavitt* (2004) 33 Cal.4th 187, 197 [14 Cal.Rptr.3d 281, 91 P.3d 222]; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Crimes Against the Person, § 134, p. 750.) As noted in connection with defendant's challenge to the sufficiency of the evidence, the killing "need not occur in the midst of the commission of the felony, so long as that felony is not merely incidental to, or an afterthought to, the killing." (*People v. Proctor, supra,* 4 Cal.4th at p. 532.) Likewise, the jury was instructed that it

could find the attempted-robbery-murder special circumstance true only if it determined, beyond a reasonable doubt, that the murder was committed while defendant was engaged in the commission of an attempted robbery and in order to carry out or advance the commission of the crime of attempted robbery or robbery, or to facilitate the escape thereof or to avoid detection. The jury also was directed that the felony-murder special circumstance is not established if the attempted robbery was merely incidental to the commission of the murder. As the elements of felony murder and the special circumstance coincide, the true finding as to the attempted-robbery-murder special circumstance establishes here that the jury would have convicted defendant of first degree murder under a felony-murder theory, at a minimum, regardless of whether more extensive instructions were given on second degree murder. (See *People v. Koontz, supra,* 27 Cal.4th at pp. 1086–1087; *People v. Earp* (1999) 20 Cal.4th 826, 886 [85 Cal.Rptr.2d 857, 978 P.2d 15]; *People v. Price, supra,* 1 Cal.4th at p. 464.) Because defendant would have been found guilty of first degree murder regardless of whether more thorough instructions had been provided relating to second degree murder, we reject defendant's claim.[9]

### c. *Torture Special Circumstance*

Defendant also contends that the trial court erroneously instructed the jury regarding the intent required for an "infliction of torture" under section 190.2, subdivision (a)(18), the torture special circumstance. The trial court instructed the jury with CALJIC No. 8.81.18, directing that a true finding as to the torture-murder special circumstance required proof that defendant intended to kill a human being; that defendant "intended to inflict extreme cruel physical pain and suffering upon a living human being" for the purpose of extortion or persuasion or for any sadistic purpose; and that defendant did in fact inflict extreme cruel physical pain and suffering upon a living human being, no matter how long its duration. Defendant argues that the trial court also should have instructed the jury that in order to find the torture special circumstance true, it had to find that the defendant harbored a premeditated intent to inflict prolonged pain. Defendant asserts that the failure to so instruct the jury violated his rights to due process of law, to trial by jury, and to a reliable penalty determination under the California Constitution and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

---

[9] The jury's verdict also defeats defendant's argument that he was prejudiced by a failure to provide a second degree felony-murder instruction premised on the underlying felony of torture. (§ 206.) (At the relevant time, the crime of torture had not yet been added to the list of felonies eligible for incorporation into a first degree felony-murder charge [see Stats. 1999, ch. 694, § 1].) The jury's true finding as to the felony-murder special circumstance under a theory involving a murder occurring in the commission of an attempted robbery establishes beyond a reasonable doubt that defendant suffered no prejudice from any failure to instruct on this score.

Defendant's argument on this point turns on the 1990 amendment of section 190.2, subdivision (a)(18). Section 190.2, subdivision (a)(18) was enacted by initiative in 1978. As enacted, section 190.2, subdivision (a)(18) made a defendant death-eligible where "the [first degree] murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration." We have construed the special circumstance, as originally enacted in 1978, as requiring proof of first degree murder, proof that the defendant intended to kill and to torture the victim, and proof of the infliction of an extremely painful act upon a living victim. (*People v. Cole, supra,* 33 Cal.4th at pp. 1227–1228; *People v. Davenport, supra,* 41 Cal.3d at p. 271.) But we also have held that no proof is required that defendant had a premeditated intent to inflict prolonged pain. (*People v. Cole, supra,* 33 Cal.4th at pp. 1227–1228; *People v. Davenport, supra,* 41 Cal.3d at pp. 269–270.)

In 1990, the electorate passed Proposition 115, the Crime Victims Justice Reform Act. Proposition 115, among other things, amended section 190.2, subdivision (a)(18) by deleting its language regarding the infliction of extreme physical pain. The special circumstance now applies where "[t]he murder was intentional and involved the infliction of torture," without providing further explanation of what constitutes the "infliction of torture" for purposes of the special circumstance.

Defendant argues that in amending section 190.2, subdivision (a)(18) by deleting its language regarding the infliction of extreme pain, the electorate that enacted Proposition 115 intended one of two results. First, the electorate may have intended to remove any requirement that torture involve "extreme physical pain." Defendant suggests that if this were the case, the special circumstance would be unconstitutional for failing to adequately narrow the pool of death-eligible defendants. (Cf. *Zant v. Stephens* (1983) 462 U.S. 862, 877 [77 L.Ed.2d 235, 103 S.Ct. 2733].) Alternatively and preferably, defendant argues, by deleting the language regarding "extreme physical pain" and failing to further define "the infliction of torture," as that phrase is used in the special circumstance, the electorate may have intended to give "torture" under the special circumstance the same meaning afforded that term for purposes of proving a murder by torture under section 189; i.e., requiring a " ' "wil[l]ful, deliberate and premeditated intent to inflict extreme and prolonged pain" ' " for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose. (*People v. Cole, supra,* 33 Cal.4th at p. 1207.) If this latter scenario is true, defendant concludes, the jury here was misinstructed because it was not directed that it had to find a premeditated intent to inflict prolonged pain.

We disagree with defendant's interpretation of the electorate's intent and reject the forced choice he offers us. "In interpreting a voter initiative, we apply the same principles that govern our construction of a statute. [Citation.] We turn first to the statutory language, giving the words their ordinary meaning. [Citation.] If the statutory language is not ambiguous, then the plain meaning of the language governs. [Citation.]" (*People v. Lopez* (2005) 34 Cal.4th 1002, 1006 [22 Cal.Rptr.3d 869, 103 P.3d 270].) " 'If, however, the statutory language lacks clarity, we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such situations, we strive to select the construction that comports most closely with the Legislature's apparent intent, with a view to promoting rather than defeating the statute['s] general purposes. [Citation.] We will avoid any interpretation that would lead to absurd consequences. [Citation.]' [Citation.]" (*People v. Montes* (2003) 31 Cal.4th 350, 356 [2 Cal.Rptr.3d 621, 73 P.3d 489].)

The language of section 190.2, subdivision (a)(18) does not expressly define what is meant by "the infliction of torture." We therefore turn to other sources. "Proposition 115 was a remedial measure enacted in June 1990 to make 'comprehensive reforms . . . in order to restore balance and fairness to our criminal justice system.' (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (June 5, 1990) Text of Proposed Law, Prop. 115, § 1, subd. (a), p. 33.) The voters expressly found 'that it is necessary to reform the law as developed in numerous California Supreme Court decisions and as set forth in the statutes of this state. These decisions and statutes have unnecessarily expanded the rights of accused criminals far beyond that which is required by the United States Constitution, thereby unnecessarily adding to the costs of criminal cases, and diverting the judicial process from its function as a quest for truth.' [*Ibid.*]" (*People v. Boulerice* (1992) 5 Cal.App.4th 463, 474–475 [7 Cal.Rptr.2d 279].) Also incorporated within the text of the proposed law were the People's findings that "the rights of crime victims are too often ignored by our courts and by our State Legislature, [and] that the death penalty is a deterrent to murder." (Ballot Pamp., *supra*, Text of Proposed Law, Prop. 115, § 1, subd. (a), p. 33.)

In light of the electorate's avowed goals in enacting Proposition 115, it is highly doubtful that the electorate sought to make it *more* difficult to prove the torture special circumstance by requiring proof of a premeditated intent to inflict prolonged pain. Indeed, other changes made to the Penal Code by Proposition 115 belie the argument that the electorate intended a sweeping change to the torture special circumstance's intent requirement. Proposition 115 created a new crime of torture, section 206, which occurs when a person

"who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another." The crime of torture therefore incorporates the same intent element deemed necessary to demonstrate an "infliction of torture" under section 190.2, subdivision (a)(18) prior to the passage of Proposition 115. (See *People v. Cole, supra,* 33 Cal.4th at pp. 1227–1228; *People v. Davenport, supra,* 41 Cal.3d at pp. 269–270.)

We infer from the above that the electorate, in amending section 190.2, subdivision (a)(18), did not mean to change its intent requirement. Rather, it accepted the previously adopted standard and codified it within the new crime of torture. Had the electorate intended a more transformative change to the special circumstance, we believe it would have more clearly manifested such an intent.

■ Consistent with decisions interpreting section 190.2, subdivision (a)(18) prior to its 1990 amendment, we conclude that for an intentional murder to involve "the infliction of torture" under section 190.2, subdivision (a)(18), as amended by Proposition 115, the requisite torturous intent is an intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose.[10] A premeditated intent to inflict prolonged pain is not required. Because the jury here was appropriately instructed to this effect, there was no error.

B. *Penalty Phase*

1. *Instruction Regarding Hearsay (CALJIC No. 2.10)*

Defendant contends that the trial court erred in instructing the jury at the penalty phase with a variant of CALJIC No. 2.10 that pertained to Dr. Vicary's testimony. The trial court instructed the jury with the following version of CALJIC No. 2.10: "There has been admitted in evidence the testimony of a medical expert of statements made by the defendant in the course of an examination of the defendant which was made for the purpose of diagnosis. Such statements may be considered by you only for the limited purpose of showing the information upon which the medical expert based his opinion. [¶] Such testimony is not to be considered by you as evidence of the truth of the facts disclosed by the defendant's statements." Defendant argues

---

[10] Our conclusion makes it unnecessary to address in detail defendant's argument that a modified torture special circumstance might insufficiently narrow the pool of death-eligible defendants. We have upheld the constitutionality of section 190.2, subdivision (a)(18) as enacted in 1978 (*People v. Davenport, supra,* 41 Cal.3d at pp. 266–271), and see no reason here to reach a contrary conclusion.

that this limiting instruction improperly removed mitigating facts from the jury's full consideration and deprived him of equal protection and due process of law, the rights to present witnesses and to trial by jury, and a reliable penalty determination in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### a. *Facts*

As discussed in part I.B.2., *ante*, Dr. William Vicary testified on behalf of the defense in the penalty phase of defendant's trial. Dr. Vicary testified at length regarding the sources he relied upon in forming his opinion that defendant was manic-depressive and suffered from an antisocial personality disorder. Dr. Vicary also testified as to the information he gleaned from each of those sources. Among Dr. Vicary's sources of information was defendant himself, whom Dr. Vicary interviewed four times. Defendant told Dr. Vicary, among other things, that he was beaten as a child and that he suffered from a long-term addiction to alcohol. Defendant's statements on these points, as related by Dr. Vicary, were generally consistent with information Dr. Vicary gleaned from investigators' reports of interviews with defendant's family members. Defendant's other statements to Dr. Vicary included assertions that he had committed far more robberies than those for which he had been apprehended, and that he had attempted to escape from jail. Dr. Vicary also testified as to the two different versions of the Gandy murder that defendant had told him.

The prosecution never raised a hearsay objection to any of Dr. Vicary's testimony. Before the prosecutor cross-examined Dr. Vicary, the judge inquired whether the prosecutor wanted the jury to be instructed with CALJIC No. 2.10. The prosecution then requested the instruction. The defense objected, arguing that CALJIC No. 2.10 was inapplicable to the circumstances. The trial court disagreed and ultimately gave the instruction at the close of the penalty phase.

### b. *Discussion*

Defendant argues that CALJIC No. 2.10 cannot be given at the penalty phase of a capital trial, at least where it is claimed to remove mitigating facts from the jury's full consideration. We addressed this issue in *People v. Stanley* (1995) 10 Cal.4th 764, 838–840 [42 Cal.Rptr.2d 543, 897 P.2d 481] (*Stanley*). In *Stanley*, at the defendant's behest, a videotaped interview between a defense psychiatrist and the defendant was played to the jury in connection with the psychiatrist's penalty phase testimony. (*Id.* at p. 785.)

The trial court instructed the jury that it could consider statements the defendant had made to the psychiatrist only for the limited purpose of showing the information upon which the psychiatrist based his opinion, and not for the truth of the facts asserted in the statements. (*Id.* at p. 838.) The defendant claimed that this instruction wrongfully removed mitigating facts contained in his statements to the psychiatrist from the jury's full consideration. (*Ibid.*)

We held otherwise, concluding that the instruction could be and was appropriately given at the penalty phase of the defendant's trial. (*Stanley, supra,* 10 Cal.4th at pp. 838–839.) While we recognized that, in rare cases, due process considerations may override state evidentiary rules so as to "require admission, at the penalty phase of a capital trial, of a highly relevant and reliable hearsay statement," in *Stanley* the defendant's statements "had no indicia of reliability." (*Ibid.*) We observed, "The statements did not predate the instant charges; rather, they were made contemporaneously with the criminal proceedings and specifically to provide evidence for the defense." (*Id.* at p. 839.) We also noted that the defendant's position would allow defendants to insulate factual assertions and self-serving testimony from any cross-examination simply by having an expert relate them to the jury. (*Ibid.*) Furthermore, "the defense was free to introduce competent evidence, including defendant's testimony, of the matters referred to on the tape." (*Id.* at pp. 839–840; see also *People v. Weaver* (2001) 26 Cal.4th 876, 979–982 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

We follow *Stanley* in rejecting defendant's analogous claim of error. The limiting instruction here was properly requested by the prosecution (see Evid. Code, § 355) and given by the trial court to clarify that defendant's statements to Dr. Vicary were to be considered only for the limited purpose of assessing Dr. Vicary's opinion. (See *People v. Weaver, supra,* 26 Cal.4th at pp. 979–982; *People v. Dennis* (1998) 17 Cal.4th 468, 534 [71 Cal.Rptr.2d 680, 950 P.2d 1035] [recognizing that a "defendant could not offer his own hearsay statements as evidence of the truth of what he told [a psychiatrist]"]; *People v. Gardeley* (1996) 14 Cal.4th 605, 619 [59 Cal.Rptr.2d 356, 927 P.2d 713] ["[A] witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact"]; *Stanley, supra,* 10 Cal.4th at pp. 838–840.) Defendant complains the prosecution had an obligation to interpose contemporaneous hearsay objections to Dr. Vicary's testimony. But here the prosecutor's request for a limiting instruction served the same purpose as hearsay objections would have, and placed defendant on notice that his statements to

Dr. Vicary were to be considered only for the limited purpose of showing the information upon which the doctor relied in forming his opinion. (*People v. Weaver, supra,* 26 Cal.4th at pp. 979–982; *Stanley, supra,* 10 Cal.4th at pp. 838–839; see also *People v. Dennis, supra,* 17 Cal.4th at pp. 533–534 [observing that the timing of a limiting instruction lies within the court's discretion].)

■ As we discerned in *Stanley, supra,* 10 Cal.4th at page 838, due process concerns sometimes may require the admission at the penalty phase of a capital trial of highly relevant and reliable hearsay statements. (See also *Green v. Georgia* (1979) 442 U.S. 95, 96–97 [60 L.Ed.2d 738, 99 S.Ct. 2150].) Assuming that the applicability of this exception is properly before us, defendant's statements to Dr. Vicary nevertheless do not fit within its parameters. Defendant's statements to Dr. Vicary were made in preparation for trial, giving defendant an incentive to prevaricate. Dr. Vicary himself acknowledged that defendant's credibility was "not good" and that defendant was a "liar" who had lied to him, to the police, and to his attorneys. Dr. Vicary acknowledged that at least one of the versions of the Gandy murder that defendant had given him was false. In sum, defendant's statements to Dr. Vicary lacked sufficient indicia of reliability for due process considerations to preclude the use of CALJIC No. 2.10.[11]

Defendant also argues that the instruction swept too broadly in that it improperly prevented the jury from considering for their truth statements in two letters defendant wrote while in jail, which Dr. Vicary read to the jury;[12]

---

[11] Further compromising defendant's due process argument is the fact that to the extent that any of his statements to Dr. Vicary could have borne any indicia of reliability—a showing that defendant, who had the burden of adducing such indicia (see *People v. Harris* (1984) 36 Cal.3d 36, 70 [201 Cal.Rptr. 782, 679 P.2d 433]), manifestly failed to make—these indicia would have derived from the statements' corroboration by other hearsay sources whose input also was related by Dr. Vicary at the penalty phase. Practically by definition, the facts conveyed in defendant's corroborated statements were cumulative and thus properly subject to exclusion by the court. (See *People v. Smithey* (1999) 20 Cal.4th 936, 996 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [holding that cumulative hearsay offered in mitigation was properly excluded at the penalty phase of a capital trial].) Also, defendant's statements to Dr. Vicary included information such as defendant's admissions that he had perpetrated numerous other robberies and that he had tried to escape from jail. The trial court specifically instructed the jury that it could not consider defendant's statements regarding these robberies as proof that he had committed them. All in all, the trial court's instructions regarding Dr. Vicary's testimony might have inured to defendant's benefit, not his detriment. (See *People v. Weaver, supra,* 26 Cal.4th at p. 981 [finding any assumed error resulting from limiting instruction based on CALJIC No. 2.10 harmless because defendant's hearsay statements also incorporated aggravating facts].)

[12] Defendant's letter "to whom it may concern" provided in pertinent part as follows: "I wish Sherri Gandy's family to know that I am really sorry for the horrible thing that I did to her. [¶] I also wish them to know that at no time was robbery ever in the picture. I did not go back to the bar to commit a crime. I went back because I was drinking—I was—in my drunken

defendant's assertions regarding prior crimes he had committed as a youth and later; and defendant's expressions of remorse for the Gandy slaying, as paraphrased by Dr. Vicary in his testimony. Defendant characterizes all of these statements as declarations against penal interest, which are not subject to the hearsay rule. (Evid. Code, § 1230.)

"With respect to the penal interest exception, the proponent of the evidence 'must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citations.]" (*People v. Lawley* (2002) 27 Cal.4th 102, 153 [115 Cal.Rptr.2d 614, 38 P.3d 461]; see also Evid. Code, § 1230.) Even assuming that defendant's argument on this point has been properly preserved, the statements at issue here do not meet this standard.

First and foremost, defendant was not "unavailable" within the meaning of Evidence Code section 1230. "Defendant was certainly not unavailable to himself. Although he possessed, and exercised, a privilege not to testify, the choice was his. He could have testified had he so elected. As stated in the Comment of the Assembly Committee on the Judiciary to Evidence Code section 240, the section defining the phrase 'unavailable as a witness,' 'if the out-of-court statement is that of the party himself, he may not create "unavailability" under this section by invoking a privilege not to testify.' " (*People v. Edwards* (1991) 54 Cal.3d 787, 819 [1 Cal.Rptr.2d 696, 819 P.2d 436].) As defendant was not "unavailable" to himself, he cannot now invoke Evidence Code section 1230.

Moreover, the statements contained in defendant's letter addressed "to whom it may concern," in which defendant said that he killed Gandy while intoxicated and that he just "snapped," plainly come across as exculpatory rather than inculpatory in light of defendant's prosecution for first degree murder. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1073–1074 [99 Cal.Rptr.2d 1, 5 P.3d 68]; *People v. Livaditis* (1992) 2 Cal.4th 759, 780 [9 Cal.Rptr.2d 72, 831 P.2d 297].) Under the totality of circumstances presented

---

stupor, I thought she liked me. I was wrong. And when she responded the way she did, I got scared, and something snapped. [¶] I remember very little of the attack—itself. [¶] [B]ut I did not take anything other than the gun and a towel out of the bar that—that's all. I swear it. [¶] Again, I am sorry."

Defendant's letter for his wife provided, in pertinent part, "I want to say to you that I am so sorry for what I did. For the first time in my life, I had everything—I thought I ever wanted. And something inside me just wouldn't let me be happy. It was like I just had to do anything I could to mess up what we had. All I can say is that I hope you are happy for the rest of your life, because you deserve it."

here, we likewise conclude that defendant's other statements were not sufficiently " 'against the declarant's penal interest when made and . . . sufficiently reliable to warrant admission despite [their] hearsay character.' [Citations.]" (*People v. Lawley, supra,* 27 Cal.4th at p. 153.)[13]

Defendant also complains that the trial court's instruction improperly singled out statements made by *defendant* to Dr. Vicary as unworthy of credence and constituted an improper comment on the evidence. While it may have been preferable for the trial judge to have broadened the instruction so that it included other sources Dr. Vicary relied upon, the instruction was not prejudicial as given. The jury no doubt grasped that the instruction was not intended as a pejorative comment on defendant's credibility or character but rather as a clarification regarding how defendant's statements to Dr. Vicary should be considered during its deliberations.[14] The fact that this instruction did not facially pertain to other sources Dr. Vicary relied upon did not imply that those sources were to be considered more trustworthy or reliable than defendant. In any event, any effect the instruction could have had if the jury had construed it differently was incontestably harmless. (See *Chapman v. California, supra,* 386 U.S. at p. 24; *People v. Watson, supra,* 46 Cal.2d at p. 836.)

### 2.  *Automatic Motion to Modify the Verdict*

Defendant also challenges the trial court's purported refusal to consider his statements to Dr. Vicary for their truth when ruling upon the automatic motion to modify the verdict pursuant to section 190.4, subdivision (e). Defendant contends that the trial court's alleged unwillingness to consider this information in connection with the motion to modify the verdict, which the court ultimately denied, denied him due process of law and a reliable penalty determination guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

---

[13] We also observe that on its face the court's instruction pertained only to statements made by defendant to Dr. Vicary "in the course of an examination . . . for the purpose of diagnosis." Neither the letter "to whom it may concern" nor defendant's second letter, written to his wife, technically fit within this description.

[14] This is particularly true given that the challenged instruction was immediately followed by another instruction directing the jury that it could not consider for its truth defendant's statement to Dr. Vicary that he had committed many other robberies. The court's instruction to the jury on this point provided, "In his testimony in the penalty phase, Dr. Vicary referred to certain crimes allegedly committed by the defendant which are different from the crimes which the Deputy District Attorney sought to prove in her case in chief in the penalty phase. You may consider his references to those crimes only for the purpose of evaluating Dr. Vicary's opinions. You may not consider his references to those crimes as evidence that the defendant in fact committed those crimes."

### a. *Facts*

The trial court's order denying the motion to modify the verdict provided, in pertinent part, "My findings are based on what, according to my understanding, the direct evidence establishes and the circumstantial evidence strongly implies. My findings concerning Mr. Elliott's [*sic*] motives, specific intents, and mental capacities and states at the time he committed the crimes of which he was been convicted in the present proceedings are based on what I believe the circumstantial evidence strongly implies. [¶] I find Dr. Vicary's testimony on these points problematic. Although Dr. Vicary cited some evidence in the record, he based his opinions mainly on inadmissible evidence." The court found, "Dr. Vicary cited many 'facts' that were never proved by competent evidence. Some of this information tended to mitigate Mr. Elliott's [*sic*] culpability. Much of it had the opposite effect." The court considered Dr. Vicary's opinions to be "often incoherent," and "[t]o the extent that any sense could be made of Dr. Vicary's opinions, they tended more to aggravate Mr. Elliott's [*sic*] culpability than to mitigate it."

The court continued, "There is no competent independent evidence, apart from the extrajudicial matters cited by Dr. Vicary, and Dr. Vicary's opinions, such as they were, that Mr. Elliott [*sic*] suffered from a cognizable mental illness immediately before, during, or after the present crimes. Dr. Vicary testified that the records and documents he reviewed reflected, and Mr. Elliott [*sic*] himself told him, that he suffered from severe psychic decompensations at several points in his life, and during some of those episodes serious seemingly psychotic symptoms manifested themselves. I am allowed to consider, and have considered, that information as it bears on the reliability of Dr. Vicary's various opinions, but I may not consider it for any other purpose. I may not and cannot base a finding as to Mr. Elliott's [*sic*] mental state at any of the times in question in this case on it." Later in its order denying the motion, the court held, "The information concerning Mr. Elliott's [*sic*] childhood was revealing and powerful. It came almost exclusively from the mouth of Dr. Vicary. There was practically no competent independent evidence of it. I am required to consider that information only as it bears on the validity of Dr. Vicary's opinions. In that regard, I think it sheds important light on Mr. Elliott [*sic*] and the man he has become. . . ."

### b. *Discussion*

Defendant argues that the trial court's ruling on the motion to modify the verdict reveals that it failed to fully consider mitigating facts incorporated within the sources relied on by Dr. Vicary, and that the trial court's failure to do so fatally compromised its ruling.

"Pursuant to section 190.4, in ruling upon an application for modification of a verdict imposing the death penalty, the trial court must reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict." (*People v. Crittenden, supra,* 9 Cal.4th at p. 150.) "On appeal, we subject a ruling on such an application to independent review: the decision resolves a mixed question of law and fact; a determination of this kind is generally examined de novo [citation]. Of course, when we conduct such scrutiny, we simply review the trial court's determination after independently considering the record; we do not make a de novo determination of penalty." (*People v. Mickey, supra,* 54 Cal.3d at p. 704.)

As discussed in part II.B.1.b., *ante,* the court correctly determined that defendant's statements to Dr. Vicary had not been admitted for their truth, but only for the purpose of establishing the basis for Dr. Vicary's opinions. The court therefore acted properly in declining to consider these statements as independent evidence of the facts they related.

Although the trial court's remark that he found Dr. Vicary's testimony "problematic" in part because Dr. Vicary "based his opinions mainly on inadmissible evidence," if viewed in isolation, might be construed as in tension with the principle that an expert may properly base an opinion on hearsay (*People v. Carpenter* (1997) 15 Cal.4th 312, 403 [63 Cal.Rptr.2d 1, 935 P.2d 708]), the record establishes the absence of error, and that defendant suffered no prejudice. The trial court later clarified that it *did* consider the statements of others that Dr. Vicary related to the extent that these statements bore upon the reliability of Dr. Vicary's opinions. Moreover, the trial court explicitly stated that it would have denied the motion even had it considered for their truth the facts related by Dr. Vicary's sources. The trial court concluded that these facts "would have 'barely altered the sentencing profile' " and "would not have changed any of [the court's] findings or conclusions, even if all the facts in question had been proven by independent and competent evidence." The court's written order denying the motion stated, "The defense penalty phase evidence evokes a certain sympathetic response. One cannot help but conclude that if the facts are as Dr. Vicary has said they are, Mr. Elliott [*sic*] himself has been in the broad sense a victim of circumstances which were beyond his control. [¶] But any such sympathy is overwhelmingly outweighed by the numerous aggravating factors reflected in the present record." The court's order reiterated, "I have considered every possible factor in mitigation and all the evidence in mitigation that was presented by the defendant, including the secondary evidence of his wretched childhood and of his history of drug abuse, mental illness and alcoholism . . . . I conclude, nevertheless, that the mitigating circumstances and factors in this case are substantially outweighed by the aggravating circumstances . . . ."

These comments establish beyond peradventure that even if the trial court had accepted the truth of the statements recounted by Dr. Vicary, it nonetheless would have denied the motion to modify the verdict.

### C. *Cumulative Error*

Defendant contends that even if the asserted errors in the guilt and penalty phases of his trial were harmless individually, when taken together they warrant reversal of the guilty verdict and sentence of death. We disagree, for "[w]e have either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial. We reach the same conclusion with respect to the cumulative effect of any assumed errors." (*People v. Sapp* (2003) 31 Cal.4th 240, 316 [2 Cal.Rptr.3d 554, 73 P.3d 433].)

### D. *Constitutional Challenges to California's Death Penalty Statutory Scheme*

Defendant also raises several constitutional challenges to the death penalty statutes. All lack merit.

The special circumstances set forth at section 190.2 are not impermissibly broad and adequately narrow the class of murders for which the death penalty may be imposed. (*People v. Griffin* (2004) 33 Cal.4th 536, 596 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Anderson* (2001) 25 Cal.4th 543, 601 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

Section 190.3, factor (a), as applied, does not result in the arbitrary and capricious imposition of death. (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244]; *People v. Lewis, supra,* 26 Cal.4th at p. 394; *People v. Jenkins* (2000) 22 Cal.4th 900, 1052–1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044].)

Section 190.3 is not unconstitutional under *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] or otherwise for failing to require unanimity as to the applicable aggravating factors. (*People v. Brown, supra,* 33 Cal.4th at p. 402.) Nor is the law unconstitutional for failing to impose a burden of proof except as to other-crimes evidence. The existence of other aggravating circumstances, the greater weight of aggravating circumstances relative to mitigating circumstances, and the appropriateness of a death sentence are not subject to a burden-of-proof qualification. (*People v. Brown, supra,* 33 Cal.4th at pp. 401–402; *People v. Snow* (2003) 30 Cal.4th 43, 126, fn. 32 [132 Cal.Rptr.2d 271, 65 P.3d 749]; *People v. Jenkins, supra,* 22 Cal.4th at p. 1054; *People v. Ochoa, supra,* 19 Cal.4th at p. 479; *People v.*

*Frye* (1998) 18 Cal.4th 894, 1029 [77 Cal.Rptr.2d 25, 959 P.2d 183]; *People v. Hawthorne* (1992) 4 Cal.4th 43, 79 [14 Cal.Rptr.2d 133, 841 P.2d 118].) We likewise reject defendant's argument that the court was required to specifically instruct the jury regarding the *absence* of any burden of proof. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 104 [33 Cal.Rptr.3d 1, 117 P.3d 622].) The court properly instructed the jury with CALJIC No. 8.88, which accurately describes how jurors are to weigh the aggravating and mitigating factors. (See *People v. Smith* (2005) 35 Cal.4th 334, 370 [25 Cal.Rptr.3d 554, 107 P.3d 229].)

The death penalty law is not unconstitutional for failing to require that the jury base any death sentence on written findings. (*People v. Brown, supra*, 33 Cal.4th at p. 402.)

Nor is the law defective for failing to require intercase proportionality review. (*People v. Brown, supra*, 33 Cal.4th at p. 402.)

The jury's consideration of unadjudicated criminal activity at the penalty phase is not unconstitutional, and the jury need not make a unanimous finding that defendant was guilty of the unadjudicated crimes. (*People v. Brown, supra*, 33 Cal.4th at p. 402; *People v. Lewis, supra*, 26 Cal.4th at p. 395.)

Section 190.3's use of adjectives such as "extreme" and "substantial" in describing mitigating circumstances does not impermissibly limit consideration of these factors. (*People v. Lewis, supra*, 26 Cal.4th at p. 395.)

The judge was not required to specifically instruct the jury that section 190.3, factors (d), (e), (f), (g), (h), and (j) could only mitigate, and not aggravate, the crime. (*People v. Brown, supra*, 33 Cal.4th at p. 402.)

Contrary to defendant's arguments, "The death penalty law does not deny capital defendants equal protection because it provides a different method of determining the sentence than is used in noncapital cases." (*People v. Smith, supra*, 35 Cal.4th at p. 374.)

The death penalty as applied in this state is not rendered unconstitutional through operation of international law and treaties. (*People v. Ramos* (2004) 34 Cal.4th 494, 533–534 [21 Cal.Rptr.3d 575, 101 P.3d 478]; *People v. Brown, supra*, 33 Cal.4th at pp. 403–404.) "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 511 [117 Cal.Rptr.2d 45, 40 P.3d 754].)

### III. DISPOSITION

The judgment is affirmed in its entirety.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Aronson, J.,[*] concurred.

Appellant's petition for a rehearing was denied January 18, 2006. Chin, J., did not participate therein.

.

---

[*]Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.