Filed 11/28/22 P. v. Phillips CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. TOBIN WAYNE PHILLIPS, Defendant and Appellant. | F081859 (Super. Ct. No. BF166772A) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County. John W. Lua, Judge.

David L Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Tobin Wayne Phillips (defendant) killed a baby. A jury found him guilty of first degree murder committed under special circumstances involving torture. Defendant was

also convicted of child assault homicide. He was sentenced to life in prison without the possibility of parole (LWOP), with a stayed term of 25 years to life.

Defendant seeks reversal on grounds of insufficient evidence. He further alleges instructional error and evidentiary error. He also complains of restrictions placed on his attorney's closing argument at trial. We reject these claims.

Defendant does raise two valid sentencing issues. First, the trial court erroneously imposed a parole revocation fine. Second, defendant could potentially avoid LWOP based on the recent amendment to Penal Code section 654. (All undesignated statutory references are to the Penal Code.) Because the amendment applies retroactively, we remand the cause for a new sentencing hearing.

## FACTUAL AND PROCEDURAL BACKGROUND

The Kern County District Attorney charged defendant with murder (§ 187; count 1) and assault upon a child under eight years of age resulting in death (§ 273ab, subd. (a); count 2). The murder was alleged to have been willful, deliberate, and premeditated (§ 189, subd. (a)), and to have involved the infliction of torture (§ 190.2, subd. (a)(18)). For enhancement purposes (§ 12022.1), it was alleged defendant committed the offenses while a felony charge was pending against him in the State of Washington. The present case was tried before a jury in August 2020.

### Events of 2016

Evidence of the following events was admitted at trial pursuant to Evidence Code sections 1101, subdivision (b), and 1109. Defendant does not dispute the admissibility of this evidence.

In November 2016, defendant was living in Washington with the mother of his three-week-old daughter. On the afternoon of November 3, 2016, the mother attended work and left the baby at home with a grandparent. Defendant eventually relieved the grandparent of the babysitting duty and, sometime thereafter, contacted the baby's mother via Facebook Messenger. Defendant's message said, "Babe, I accidentally hit her

2.

nose and head on the door while, like, rocking her. What do I do? I am freaking out. She has a bruise and is crying." The mother asked defendant to pick her up from work immediately, but he refused. She then requested the child be taken to the hospital.

After several calls back and forth between defendant and the baby's mother, defendant finally drove to the hospital. While en route, he stopped at the mother's place of employment. At that point, according to the mother's testimony, the baby "looked like she got beat up pretty bad."

Healthcare providers at the hospital were suspicious of the child's injuries and contacted law enforcement. When questioned by police, defendant claimed to have accidentally swung the baby's head into a doorknob—twice. The child also had bruising to "the sternum/chest area," which defendant tried to explain by suggesting "it was from holding the baby and comforting the baby tightly after the injury to the head." Under subsequent interrogation by different investigators, he gave an alternate explanation for the chest injury. Defendant reportedly described "how he burped her facedown, [with] his palm on her chest [while] burping her on her back."

Two days later, the baby was examined by a nurse practitioner, Teresa Forshag. Nurse Forshag specialized in the detection of physical child abuse. Testifying in both a percipient and expert capacity, she said the infant had "extensive bruising … on her left forehead, down over her left eye, over her nose, her left cheek, … left shoulder, and on her abdomen." In the nurse's opinion, the injuries bore the "classic" hallmarks of "high-force open-handed slaps." She further opined defendant's doorknob story "wouldn't explain the multitude of injuries on this baby."

On November 8, 2016, defendant was charged with committing felony assault upon his newborn daughter. He was released from custody on his own recognizance pending trial. The conditions of his release prohibited defendant from leaving "the State of Washington or Northern Idaho … without written court approval." He promptly absconded to California.

By December 2016, defendant was residing with a childhood friend who lived in Tehachapi. They had "reconnected over Facebook" around the time of his arrest. The friend was a single mother of two small children. The younger child (the victim) was approximately seven months old when defendant moved into their apartment.

***Events of 2017***

On January 2, 2017, the victim's mother went to work and left her children in defendant's care. She lent defendant her mobile phone, which allowed them to communicate via Facebook Messenger. He used an application on the phone, and she used her work computer. They exchanged messages between approximately 3:00 p.m. and 6:30 p.m.

At approximately 7:30 p.m., after defendant had failed to respond to prior messages, the victim's mother wrote, "I guess you are busy. I'll see you when I get home." Defendant finally responded at 9:28 p.m. His message said, "I'm sorry." Assuming this was in reference to the earlier exchange, the victim's mother replied, "Okay. See you at home."

Sometime after 11:00 p.m., the mother arrived home and found the dead body of her eight-month-old son. The baby was naked and lying face up on a piece of furniture, cold to the touch. The older child was unharmed and sleeping. Defendant had apparently fled.

A few hours later, at approximately 1:00 a.m., police located defendant outside of a nearby gas station. He was bleeding from self-inflicted wounds to his arms and neck. The arresting officers testified defendant was calm, cooperative, and unemotional.

Defendant was taken into custody and transported to a hospital. When the attending physician asked why he had harmed himself, defendant admitted to killing the baby. He also said, "It happened at about 8:00 p.m."

*Pathologist's Testimony*

The People's theory of special circumstance murder was largely based on the testimony of a forensic pathologist, Eugene Carpenter, Jr. Dr. Carpenter testified to the results of the victim's autopsy, which he had performed on January 4, 2017. He concluded the baby died "from a violent, extreme strangulation process."

The deceased victim was observed and photographed with facial injuries, including "significant" bruising around the chin and "distinct bruises at the forehead." There was also a "severe," geometrically patterned abrasion on the back of the child's head. Retinal hemorrhaging and other signs of head trauma, combined with multiple "fingertip-size bruises" to the right and left of the spine, suggested the victim had been shaken and slammed into "an edge of furniture or something like it."

Dr. Carpenter also testified about what he believed to be a "left nipple injury" caused by "very forceful[]" pinching. He described a photograph of the injury as showing "a fingernail mark inwardly from the nipple" and "a larger area of red-blue bruising [visible] through the surface of the skin." According to his testimony, bruising from nipple pinching is a "commonly reported injury in many child abuse-type cases," including those with infant victims. Dr. Carpenter had never personally encountered such an injury and found this one to be "very peculiar," so he "paid [extra] attention to it." He diagrammed the injury and saved the tissues "for potential further study," noting the evidence of bleeding in a volume of "about a third to a half of an inch by a third of an inch by about a fourth of an inch."

The victim also had "severe" bruising to the upper throat. Dr. Carpenter testified the bruising was of a degree "rarely seen in even adult strangulations" and revealed that an "extraordinarily extreme" amount of pressure had been applied to the neck. The injuries were therefore "consistent with deliberate killing of the baby."

Dr. Carpenter explained that bruising generally requires blood pressure and is thus indicative of a beating heart. Therefore, the visible injuries were presumably inflicted while the victim was still alive. Evidence of brain hemorrhaging also supported this

5.

conclusion. In other words, the blunt force trauma and nipple pinching likely happened before the victim was strangled.

*Verdict and Sentencing*

The jury deliberated for approximately two hours, not including breaks and time spent listening to a readback of Dr. Carpenter's testimony. Defendant was convicted as charged on both counts. All sentencing allegations were found true.

Sentencing took place in October 2020. The punishment for count 1 was LWOP. The punishment for count 2 was 25 years to life, which was stayed pursuant to section 654. As to both counts, a two-year enhancement was imposed under section 12022.1 but stayed pursuant to subdivision (d) of the same statute.

## DISCUSSION

### I. Sufficiency of the Evidence

Defendant challenges the verdict of first degree murder and the jury's special circumstance finding. He argues there was insufficient evidence of premeditation and deliberation, or even the intent to kill. He also disputes the evidence of torture. The claims fail for the following reasons.

#### A. Standard of Review

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt." (*People v. Boyer* (2006) 38 Cal.4th 412, 479.) We construe the record in the light most favorable to the judgment and presume "'the existence of every fact the jury could reasonably have deduced from the evidence.'" (*People v. Mendez* (2019) 7 Cal.5th 680, 702.) This standard governs appellate review of convictions and special circumstance findings. (*People v. Suarez* (2020) 10 Cal.5th 116, 171.)

"'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Grant* (2020) 57 Cal.App.5th 323,

6.

330.) It is the jury's role "to decide whether an inference should be drawn and the weight to be accorded the inference." (*People v. Massie* (2006) 142 Cal.App.4th 365, 374.) "Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053–1054.)

### B.    Evidence of First Degree Murder

"Both first and second degree murder require proof of an unlawful killing committed with malice aforethought, but only the former requires evidence of willfulness, premeditation, and deliberation." (*People v. Wilson* (2021) 11 Cal.5th 259, 296-297; accord, § 189.) "'Willful' is synonymous with 'express malice':  in other words, a specific intent to kill.  [Citation.]  Premeditation occurs when the killing is "'considered beforehand,'" and deliberation occurs when the decision to kill is "'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'"'" (*People v. Mejia* (2012) 211 Cal.App.4th 586, 604.)

Defendant argues the evidence was "not incompatible" with a theory of accidental death.  However, "[t]he mere *possibility* of a contrary finding as to defendant's mental state does not warrant a reversal of the guilt judgment." (*People v. Brady* (2010) 50 Cal.4th 547, 565.)  As stated in *People v. Hernandez* (1988) 47 Cal.3d 315, manual strangulation "is indicative of at least a deliberate intent to kill." (*Id*. at p. 349; accord, *People v. Frank* (1985) 38 Cal.3d 711, 733.)  Dr. Carpenter's testimony provided ample evidence of strangulation, which was sufficient to permit a finding of willfulness.

As for premeditation and deliberation, "the requisite reflection need not span a specific or extended period of time.  Thoughts may follow each other with great rapidity, and cold, calculated judgment may be arrived at quickly." (*People v. Nelson* (2011) 51 Cal.4th 198, 213.)  ""'The true test is not the duration of time as much as it is the extent

of the reflection."'" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080; see *People v. Lenart* (2004) 32 Cal.4th 1107, 1127 ["Premeditation and deliberation do not require much time"].) "A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported— preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination.'" (*People v. Jurado* (2006) 38 Cal.4th 72, 118; accord, *People v. Booker* (2011) 51 Cal.4th 141, 173 ["These three categories are merely a framework for appellate review"].)

The case of *People v. Disa* (2016) 1 Cal.App.5th 654 involved the use of a "carotid restraint hold, which can render a victim unconscious within a few seconds and dead in a minute." (*Id*. at p. 666.) The killer admitted to applying the hold "'for about a minute or so'" before the victim's body went limp, "and then he kept her in the hold '[m]aybe 15 seconds' after she stopped moving." (*Id*. at p. 660.) Although the evidence was "not overwhelming," the *Disa* court held the jury could have found premeditation and deliberation occurred as late as within those final 15 seconds. (*Id*. at p. 666.)

Here, the prosecutor argued the victim was strangled for "a minimum of three and a half minutes." The argument relied on Dr. Carpenter's "ballpark" estimate, which was derived from statistical data on adult strangulations. He testified "that if the veins draining the blood from the brain of an adult are consistently persistently occluded," the adult will stop breathing within three and a half to four minutes. "If breathing does not resume …, then the heart will stop probably eight, ten minutes, 12 minutes later. So after the breathing stops after about four minutes in adults, death is on its way." Because an infant's blood "carries more oxygen and is more resistant to low oxygen," it was Dr. Carpenter's "educated guess" that "it would probably take a little longer for the infant to stop breathing." Accordingly, the duration of strangulation was estimated to be "about four or five minutes, somewhere in that area."

Defendant concedes that evidence of strangulation for a period of minutes has been held sufficient to establish premeditation and deliberation. "This prolonged manner of taking a person's life, which requires an offender to apply constant force to the neck of the victim, affords ample time for the offender to consider the nature of his deadly act." (*People v. Hovarter* (2008) 44 Cal.4th 983, 1020; see, e.g., *People v. Davis* (1995) 10 Cal.4th 463, 510 [strangling of an already injured victim occurred "over a period of *up to five minutes*"]; *People v. Shamblin* (2015) 236 Cal.App.4th 1, 11 [manual strangulation of victim "could have taken anywhere from one to five minutes"].) Defendant also concedes there was "some evidence related to lengthy strangulation." However, because the expert acknowledged the possibility of other scenarios, defendant complains "there is no way to determine that the strangling lasted for minutes."

Defendant selectively quotes from Dr. Carpenter's testimony "that a blow to the neck or even just pressure on the neck can cause the heart to just stop beating right away," as might result from a "karate chop to the throat." Defendant ignores the testimony about such occurrences being rare, e.g., "[I]t seems that only a few people are susceptible to such a blow." Dr. Carpenter admitted he did not know if the victim sustained "a blow to the throat," but he immediately added, "Such a blow would not cause all the bruising that [the victim] had." Considered in its entirety, the testimony does not invalidate the jury's verdict. (See *People v. Navarro* (2021) 12 Cal.5th 285, 307 ["We ask not whether the jury's judgment was the most probable interpretation of the evidence, but simply whether it was a rational one"].)

On cross-examination, Dr. Carpenter testified it was "theoretically" possible "there may have been a violent strangulation process which was stopped and then later something else was used or caused the death." He also admitted "the strangulation may have only lasted a minute or so because the head [was] being violently struck against [multiple surfaces]." Defendant's reliance on this testimony is misguided because, as discussed, premeditation and deliberation can occur within one minute. (See, e.g., *People*

*v. Disa*, *supra*, 1 Cal.App.5th at pp. 665–666; *People v. Shamblin*, *supra*, 236 Cal.App.4th at p. 11.) The jury was not bound by the People's theory of a more prolonged period of strangulation. (See *People v. Clark* (2011) 52 Cal.4th 856, 947 ["theories suggested by the prosecutor are not the sole theories the jury may consider in making its determination of guilt"]; *People v. Perez* (1992) 2 Cal.4th 1117, 1126 [same].)

Premeditation and deliberation were also inferable "[f]rom the evidence that defendant used multiple means of attacking and killing [the victim]." (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 492.) Defendant's violent infliction of injuries to the baby's face, *and* back of the head, *and* chest, *and* throat allowed for a reasonable inference of "'preexisting thought and reflection.'" (*People v. Jurado*, *supra*, 38 Cal.4th at p. 118; cf. *People v. Lewis* (2009) 46 Cal.4th 1255, 1293 ["even if the initial strangulation was spontaneous, the additional act of slashing [the victim's] throat" was "'indicative of a reasoned decision to kill'"].) "'The jury *could* have reasonably found that the victim's injuries reflected an emotional, berserk attack, as suggested by defendant's briefing. But it was permitted to find otherwise.'" (*Pettigrew*, at p. 493, quoting *People v. Williams* (2018) 23 Cal.App.5th 396, 410.)

### C. Evidence of Special Circumstance Murder

#### 1. *Applicable Law*

"To find the torture-murder special circumstance true, the jury had to find that '[t]he murder was intentional and involved the infliction of torture.'" (*People v. Elliot* (2005) 37 Cal.4th 453, 469, quoting § 190.2, subd. (a)(18).) "[F]or an intentional murder to involve 'the infliction of torture' … the requisite torturous intent is an intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose." (*Elliot*, at p. 479.) "'The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the victim's body.'" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1187.) "For example, evidence that the defendant intentionally inflicted nonlethal

10.

wounds on the victim may demonstrate the requisite "'sadistic intent to cause the victim to suffer pain in addition to the pain of death.'"" (*Id*. at p. 1188.) Because the focus "is on defendant's *intent* to inflict pain and suffering, … [i]t need not be demonstrated that the victim was actually conscious and suffered pain at the time otherwise painful injuries were inflicted." (*People v. Powell* (2018) 5 Cal.5th 921, 945.)

The essential elements are distinct from those required for murder by torture as defined by section 189. (*People v. Powell*, *supra*, 5 Cal.5th at p. 944.) "Unlike first degree murder by torture, … the special circumstance does not require that the acts constituting the torture cause the death. [Citation.] Rather, "'some proximity in time [and] space between the murder and torture'" will suffice." (*People v. Jennings* (2010) 50 Cal.4th 616, 648.)

### 2. *Defendant's Arguments*

In reliance on section 206, which defines the separate and uncharged crime of torture, defendant argues the special circumstance finding required proof the victim sustained great bodily injury separate and apart from death itself. Section 206 requires the infliction of "great bodily injury as defined in Section 12022.7," i.e., "a significant or substantial physical injury" (§ 12022.7, subd. (f)). "Abrasions, lacerations, and bruising can constitute great bodily injury." (*People v. Jung* (1999) 71 Cal.App.4th 1036, 1042.)

Defendant's claim regarding the supposed great bodily injury requirement is confusing. He begins by acknowledging "'[i]t is obvious that the offense of murder involves the ultimate infliction of great bodily injury.'" (Quoting *People v. Lewis* (1993) 21 Cal.App.4th 243, 248.) Then, after arguing the victim's nipple injury could not have reasonably been found to constitute great bodily injury, he concedes the victim sustained other injuries "that clearly did rise to that level." He repeats the concession in his reply brief.

Defendant's concession makes it unnecessary to discuss whether the nipple pinching resulted in great bodily injury. We note, however, that "great bodily injury is

not a question of law for the court but a factual inquiry to be resolved by the jury." (*People v. Cross* (2008) 45 Cal.4th 58, 64.) Furthermore, torture may be found even if "no single act in the perpetrator's course of conduct" results in great bodily injury. (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1429.) "[W]here the *cumulative result* of the course of conduct is great bodily injury, and the requisite intent can be found, then the crime of torture has been committed …." (*Ibid.*, italics added.)

Defendant's remaining arguments concern the element of intent. First, he claims there was no evidence of a sadistic purpose behind his actions. Second, he claims the People failed to prove his torturous intent coincided with the intent to kill. Defendant argues "there was at least a 90-minute window during which the injuries could have been inflicted, and it would require guessing to conclude when each injury was inflicted and in what order."[1] He reasons "the torture, if any, could have occurred early in the process and well before and completely divorced from the formation of any intention to kill."

### 3. Analysis

As discussed, "evidence that the defendant intentionally inflicted nonlethal wounds on the victim may demonstrate the requisite "'sadistic intent to cause the victim to suffer pain in addition to the pain of death.'"" (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1187, quoting *People v. Bemore* (2000) 22 Cal.4th 809, 841.) The prosecutor focused on the gratuitously cruel act of pinching the baby's nipple, but, as defendant concedes, the prosecutor also relied on the "combination" of injuries inflicted up to the point of death. Those other injuries included bruising to multiple areas of the face, fingernail markings on the face and throat, bruising consistent with "the fingertips digging into the skin area of the left buttock," "fingertip-size bruises" on both sides of the baby's spine, and the "severe" abrasion on the back of the head.

---

[1] The "90-minute window" is based on the approximate time he stopped replying to the victim's mother's electronic communications (6:30 p.m.) and his statement at the hospital that "[i]t happened at about 8:00 p.m."

12.

Defendant relies on *People v. Mungia* (2008) 44 Cal.4th 1101 (*Mungia*), which is distinguishable. The *Mungia* appellant entered the home of an elderly woman for the purpose of obtaining money. He had a criminal past and had previously said "that if he ever committed another robbery, he would have to kill the victim to avoid being identified." (*Id*. at p. 1106.) He did in fact kill the victim of his residential robbery, "hitting her repeatedly in the head with a blunt object." (*Id*. at p. 1137.) The victim "also sustained defensive wounds to her hands, as well as minor wounds to her arms and shoulders." (*Ibid*.)

The *Mungia* court reversed a torture-murder special circumstance finding for insufficient evidence. "The killing was brutal and savage, but there [was] nothing in the nature of the injuries to suggest [the appellant] inflicted any of them in an attempt to torture [the victim] rather than to kill her." (*Mungia*, *supra*, 44 Cal.4th at p. 1137.) The *Mungia* opinion cautions "'against giving undue weight to the severity'" of a victim's wounds because "severe injuries may also be consistent with the desire to kill, the heat of passion, or an explosion of violence." (*Ibid*.) But subsequent cases make clear a killer's torturous intent may, and often must, "'be proved by the circumstances surrounding the commission of the offense [citations], which include the nature and severity of the victim's wounds.'" (*People v. Smith* (2015) 61 Cal.4th 18, 52; accord, *People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1187.)

The victim in *Mungia* was vulnerable but nevertheless capable of resisting her attacker, hence the "defensive wounds to her hands." (*Mungia*, *supra*, 44 Cal.4th at p. 1137.) The victim in this case, an eight-month-old baby, was completely defenseless. Therefore, every nonlethal wound inflicted upon the baby was probative of defendant's mental state. "Such wounds support a finding of [torturous] intent because they 'evidence[] deliberate and gratuitous violence beyond that which was necessary to kill the victim.'" (*People v. Powell*, *supra*, 5 Cal.5th at p. 944; see *People v. Hajek and Vo*,

13.

*supra*, 58 Cal.4th at p. 1188 [the victim's inability "to resist a defendant's acts of violence" may indicate an intent to torture].)

In *Mungia*, there was no evidence "that the [appellant] deliberately inflicted nonfatal wounds or deliberately exposed the victim to prolonged suffering." (*Mungia*, *supra*, 44 Cal.4th at p. 1137.) Although he had "bound the victim in the course of robbing her," the evidence of binding was held insufficiently probative because "it is not uncommon for robbers to bind their victims to prevent them from resisting or escaping." (*Id.* at p. 1138.) In this case, the baby was totally incapable of resisting or escaping. The jury could thus infer that the nonfatal injuries, i.e., those apart from what the pathologist called an "extreme injury to the muscles of the throat," were indicative of a torturous intent. (See *People v. Edwards* (2013) 57 Cal.4th 658, 716 ["evidence of an 'unusually forcible strangulation attempt' together with other violent acts" may be sufficient to show an "intent to inflict extreme and prolonged pain"].)

Further distinguishing this case from *Mungia* is defendant's commission of a similar crime two months earlier. Viewed together, defendant's extreme violence in this case and the prior physical abuse of his three-week-old daughter permitted an inference that he experienced sadistic gratification from harming infants. The weight to be accorded this inference, if any, was entirely up to the jury. (*People v. Massie*, *supra*, 142 Cal.App.4th at p. 374.) In terms of legal sufficiency, the pattern of infant child abuse and the multitude of nonlethal injuries sustained by the victim "provided substantial evidence of an intent to inflict pain and suffering for their own sake." (*People v. Powell*, *supra*, 5 Cal.5th at p. 948; cf. *People v. Odom* (2016) 244 Cal.App.4th 237, 248 ["That the great bodily injury was inflicted with 'fists and feet' does not negate the substantial evidence of intent to cause cruel or extreme pain and suffering"].)

Defendant's final argument pertains, in his words, to "the requisite concurrence of torture and intent to kill." He relies on an excerpt from *People v. Jennings*, *supra*, 50 Cal.4th 616: "The relevant inquiry … is whether [the appellant] harbored an intent to kill

when he tortured [the victim]." (*Id.* at p. 647.) However, *Jennings* has been interpreted as holding that "torture can consist of a course of conduct and the intent to kill *need not be conjoined with every act within that continuum*." (*People v. Odom*, *supra*, 244 Cal.App.4th at p. 250, italics added, citing *Jennings*, at p. 647.)

In *Jennings*, a five-year-old boy was subjected to prolonged torture in the form of malnourishment, physical punishment, and the administration of nonprescribed medications. (*People v. Jennings*, *supra*, 50 Cal.4th at pp. 627, 631–633, 640–641.) A pathologist determined the "'main cause of death'" to be "'combined drug toxicity'" (the child was given a potentially fatal dose of sleeping pills the day he died) and identified "'acute and chronic physical abuse and neglect'" as other contributing causes. (*Id.* at p. 633.) The word "'acute'" was in reference to the victim being struck "on the back of the head with a fireplace shovel shortly before he died." (*Id.* at pp. 633, 653.)

In challenging a torture-murder special circumstance finding, the *Jennings* appellant focused on the "allegedly innocuous intent in giving [the victim] the sleeping pills, argu[ing] there was insufficient evidence of his intent to kill." (*People v. Jennings*, *supra*, 50 Cal.4th at p. 647.) The high court responded with the previously quoted statement: "The relevant inquiry … is whether [the appellant] harbored an intent to kill when he tortured [the victim]," i.e., during "the continuous infliction of serious and possibly life-threatening physical injuries while deliberately and systematically starving [the victim] to the point of emaciation." (*Ibid.*) The court cited "one of his last acts of torture—hitting [the victim] on the back of the head with a shovel so hard that it caused a large, gaping wound—" as an example of potentially lethal conduct evidencing the intent to kill. (*Ibid.*)

In the more recent *Odom* case, the victim was repeatedly punched and kicked over a period of approximately 45 minutes. (*People v. Odom*, *supra*, 244 Cal.App.4th at p. 249.) During the beating, he was struck at least once with a baseball bat. (*Id.* at p. 243.) The victim was then bound and gagged, transported to another location, and killed

execution-style with a gunshot to the head. (*Id*. at pp. 241, 249.) On appeal from a conviction of first degree murder with a torture-murder special circumstance finding, the killer argued "the evidence showed, at most, that she did not decide to kill [the victim] until after the beating." (*Id*. at p. 248.)

The *Odom* appellant relied on the same *Jennings* quote upon which defendant bases his claim, arguing the special circumstance requires proof of a contemporaneous intent to kill during the infliction of torture. (*People v. Odom*, *supra*, 244 Cal.App.4th at p. 250.) The appellate court said, "As the next sentence in [*People v.*] *Jennings*, *supra*, 50 Cal.4th at page 647 makes clear, torture can consist of a course of conduct and the intent to kill need not be conjoined with every act within that continuum." (*Odom*, at p. 250.)

We understand the requirement of "'some proximity in time [and] space between the murder and torture'" to encompass both the actus reus and mens rea. (*People v. Bemore*, *supra*, 22 Cal.4th at p. 843.) "The [special circumstance] statute obviously does not apply where 'no connection' between the two events appears." (*Ibid*.) Even assuming defendant's infliction of torture occurred intermittently over a period of hours, there is sufficient evidence of a connection between the intent to torture and intent to kill. The jury could have relied on the evidence of violent shaking and/or the severe abrasion on the back of the head. Dr. Carpenter testified both were potentially lethal, but the ultimate cause of death was strangulation. (Cf. *People v. Jennings*, *supra*, 50 Cal.4th at p. 627; *People v. Barnett* (1998) 17 Cal.4th 1044, 1162 ["Significantly, the evidence established [the appellant] never freed or relinquished control over [the victim] from the time of the torture to the time of the murder. That [the victim] was left alone naked and tethered to a tree to suffer from his injuries until [the appellant] returned to fatally stab him was not sufficient to separate the torture from the murder"].)

16.

## II.	Dr. Carpenter's "Deliberate Killing" Testimony

Dr. Carpenter testified this case involved "an outright strangulation death consistent with deliberate killing of the baby." Fixating on the word "deliberate," and ignoring the surrounding context, defendant seeks reversal based on the trial court's overruling of a motion to strike the testimony. As we explain, Dr. Carpenter was addressing the issue of accidental versus nonaccidental death. He was not speaking in terms of the deliberation requirement of section 189. Any error in admitting the testimony was harmless.

### A.	Background

As defendant is unwilling to acknowledge the context in which the disputed statement was made, we quote extensively from the trial transcript.

"[PROSECUTOR:] Q. You mentioned that, based on your training and experience, infant strangulation cases are very rare. Is that correct?

"[DR. CARPENTER:] A. Yes, so rare that they're not even discussed in this major 2015 forensic pathology mainstream textbook.

"Q. Would you say that more commonly infants are killed, based on your training and experience, through either shaking or blunt head or abdominal trauma?

"A. Yes, the blunt head trauma and abdominal trauma are the two chief causes. Shaking is a mechanism that most highly probably involves head impacts; so it's head trauma and trauma to the abdomen or together are the main causes.

"And I've also seen evidence of smothering in one or two cases since I've been here in 2013, but none in L.A. County over 25 years and none in the reported cases by the other 25 pathologists there.

"Q. Are you aware, sir, of why infant strangulation cases are so rare?

"A. Yes.

"Q. Can you please tell the jury.

"A. When infants die at the hands of another or others, almost always it's accidental or unintentional. They have—people will have

17.

different techniques that they think is effective in keeping the—stopping the infant from crying, and shaking is one of—might be one of them. It's violent shaking. And the other might be to cover the mouth and the nose until the infant passes out. But, for the most part, these are tragic situations where the different ignorant techniques lead to injuries to the children that live and then occasionally cause the death.

"It is very unusual for infants to be intentionally killed. I've had one or two cases here in Kern County since 2013 and none were really in L.A. County or reported, and the case I'm referring to is a child picked up by the leg and slammed into the wall, which is a deliberate act of homicide in the legal sense, but those are rare. Parents tragically, occasionally, accidentally, through ignorance and other factors in their life, like clouded consciousness from drugs, et cetera, will accidentally kill their children, but not deliberately.

"Q. Based on your training and experience, sir, most infant deaths that you see are sort of shaking or blunt trauma with the intent to quiet the child as opposed to this, which would be an intent to kill the child. Is that correct?

"[DEFENSE COUNSEL]: Objection. Leading; calls for legal conclusion.

"THE COURT: Sustained as phrased. [¶] … [¶]

"Q. Is there a distinction in your mind, Doctor, between most infant cases, most infant deaths, with, as you said, the parents want to quiet the child, become frustrated, and maybe take an ignorant approach to quiet the child versus what you saw in this case?

"A. Yes.

"Q. And what's the difference?

"A. Even the mainstream forensic textbook I referred to by Bernard Knight refers to a case like this as an outright murder. It's not even classified in the same category as infant deaths due to impacts of the head associated with the violent shaking or the abdominal trauma even where the infant's punched in the abdomen or kicked in the abdomen suddenly out of anger and loss of temper. This type of death is classified—it's not even really discussed, as I've already said, but it's basically referred to in just the strangulation chapter on adults. This is just an outright strangulation death consistent with deliberate killing of the baby.

18.

"[DEFENSE COUNSEL]: Your Honor, I would move to strike the doctor's references to the words 'murder' and 'deliberate.' Those are legal terms. They call for a legal conclusion that the expert's not required to give opinions on—not qualified to give opinions on. [¶] … [¶]

"[PROSECUTOR]: I think, based on his training and experience, he's not being asked to make a legal finding as to murder, just what the injuries tell him.

"THE COURT: Thank you.

"Counsel, the Court is going to grant and deny the last request by [defense counsel] only as it relates to the witness's answer directly referencing the phrase 'outright murder.' The Court is going to strike that from the witness's answer even though the witness has based his answer on training and experience that he has accumulated over decades of service.

"As it relates to the motion to strike the word 'deliberate,' the Court is going to deny that request finding that it is consistent with the everyday nomenclature and vernacular in the use of that word specifically related to how this witness used that word in his answer.

"For those reasons, the Court is going to order the jurors to disregard the phrase 'outright murder' in the witness's last answer and completely disregard it from the evidence, but you nonetheless can still consider the rest of the answer that the witness has provided."

## B.     Analysis

"Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.)  "However, the admissibility of opinion evidence that embraces an ultimate issue in a case does not bestow upon an expert carte blanche to express any opinion he or she wishes." (*Summers v. A. L. Gilbert Co.* (1999) 69 Cal.App.4th 1155, 1178.)  Opinion testimony regarding a defendant's guilt or innocence is generally inadmissible.  (*People v. Duong* (2020) 10 Cal.5th 36, 60–61.)

"A trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion." (*People v. Pearson* (2013) 56 Cal.4th 393, 443.)  Rather than determine whether the challenged testimony was admissible, we reject defendant's claim for lack of any possible prejudice.  "The erroneous admission of expert testimony only

19.

warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Prieto* (2003) 30 Cal.4th 226, 247.)

As used in section 189, murder is "deliberate" if the killer engaged in deliberation, i.e., "careful weighing of considerations in forming a course of action." (*People v. Koontz, supra*, 27 Cal.4th at p. 1080.) Defendant argues Dr. Carpenter "basically told the jury that, in his opinion, the legal element of deliberation for purposes of first degree murder was present." Defendant continues: "[I]t cannot be said that he used the term in anything other than its legal sense, thereby expressing a legal conclusion regarding [defendant's] guilt." We disagree.

Considering the jury was instructed on deliberation pursuant to CALCRIM No. 521, and given the clear context in which the statement was made, it is not reasonably probable the jury understood Dr. Carpenter's use of the word "deliberate" to mean anything other than "intentional" or "nonaccidental." At worst, the expert inappropriately verbalized what would have been obvious to any rational trier of fact: the evidence was "consistent with" a theory of nonaccidental homicide.

## III. Alleged Instructional Errors

A legally erroneous jury instruction may be challenged for the first time on appeal. (*People v. Frazier* (2001) 89 Cal.App.4th 30, 35, fn. 3.) Defendant alleges two such errors with regard to CALCRIM No. 733. He separately complains of the failure to instruct on voluntary manslaughter as a lesser included offense of murder. The standard of review is de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; *People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

### CALCRIM No. 733

The jury was instructed on the special circumstance allegation pursuant to CALCRIM No. 733. The instruction read as follows:

20.

"The defendant is charged with the special circumstance of murder involving the infliction of torture in violation of … section 190.2(a)(18).

"To prove that this special circumstance is true, the People must prove that:

"1.  The defendant intended to kill [the victim];

"2.  The defendant also intended to inflict extreme physical pain and suffering on [the victim] while that person was still alive;

"3.  The defendant intended to inflict such pain and suffering on [the victim] for the calculated purpose of revenge, extortion, persuasion, or any other sadistic reason;

"AND

"4.  The defendant did an act involving the infliction of extreme physical pain and suffering on [the victim].

"There is no requirement that the person killed be aware of the pain.

"*Sadistic reason* means the infliction of pain on another person for the purpose of experiencing pleasure.

"There is no requirement the defendant intend to inflict prolonged pain.

"The prosecution is not required to prove that the acts of torture inflicted upon [the victim] were the cause of his death."

The instruction correctly stated the law.  (See *People v. Edwards*, *supra*, 57 Cal.4th at p. 718 [discussing the requirements of § 190.2, subd. (a)(18)].)  However, defendant claims CALCRIM No. 733 is defective because it fails to identify two additional elements:  "(1) the defendant harbored an intent to kill *when* he committed the act of torture, and (2) the tortuous [*sic*] act inflicted great bodily injury."  We disagree.

As defendant concedes, the jury was separately instructed with CALCRIM No. 252 on the required concurrence of act and intent.[2]  Defendant alleges further

_____

[2]The instruction stated, in relevant part:  "The crimes and allegation charged in this case require proof of the union, or joint operation, of act and wrongful intent.  [¶] … [¶] The following crime and allegation require a specific intent or mental state:  first degree murder, as charged in Count 1; the special circumstance of torture, as alleged in Count 1; and a lesser

21.

guidance was necessary because "CALCRIM 252 did not expressly reference the intent to kill and its relationship to the act of torture." The crux of his argument is the jury may have overlooked the possibility his intent to kill was not formed until after the acts of torture were complete. However, "an after-formed intent instruction is a pinpoint instruction that a trial court has no obligation to give when neither party has requested that it be given." (*People v. Silva* (2001) 25 Cal.4th 345, 371.)

The issue of after-formed intent typically arises in a robbery context—the argument being a defendant's intent to steal was not formed until after his or her use of force against the victim. (See, e.g., *People v. Moore* (2011) 51 Cal.4th 386, 408–409; *People v. Silva*, *supra*, 25 Cal.4th at p. 371.) But the principle can apply to other special circumstance allegations, and it is incumbent upon defense counsel to highlight the issue. (See, e.g., *People v. Jones* (2003) 29 Cal.4th 1229, 1258–1259 [no sua sponte duty to instruct "that defendant was guilty of rape felony murder only if the intent to rape was formed before the murder occurred"].) We therefore reject defendant's claim of error by the trial court in failing to instruct "on an essential element" of section 190.2, subdivision (a)(18).[3] (See *People v. Cole*, *supra*, 33 Cal.4th at p. 1211 ["Defendant did not ask the trial court to clarify or amplify the instruction. Thus, he may not complain on appeal that the instruction was incomplete"].)

Defendant's other claim relies on section 206. As discussed, the statute defines torture to include the infliction of "great bodily injury as defined in Section 12022.7 upon

---

included offense to Count 1 of second degree murder. For you to find a person guilty of this crime or to find the allegation true, that person must not only intentionally commit the prohibited act, but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime or allegation."

[3]Defendant correctly anticipated the People would argue his claims of instructional error were forfeited due to a failure to object. His opening brief includes a contingent claim of ineffective assistance of counsel (IAC) based on his trial attorney's failure to "object to the instructional omissions." Regarding prejudice, he argues "[t]he trial court would have been required to instruct on the missing elements if their omission was brought to its attention." We do not interpret this cursory IAC claim as being based upon counsel's failure to request a pinpoint instruction.

the person of another." However, the torture-murder special circumstance existed long before torture was recognized as an independently punishable offense. "The crime of torture was codified in California in June 1990, when the California electorate passed Proposition 115 in response to the facts in *People v. Singleton* (1980) 112 Cal.App.3d 418.… Singleton was paroled after having served just seven years in prison and thereafter the new crime of torture was included in 'Proposition 115 "to insure that crimes such as Singleton's receive a minimum punishment of life imprisonment."'" (*People v. Pre* (2004) 117 Cal.App.4th 413, 425 (conc. & dis. opn. of McIntyre, J.).) Section 206 "was not intended to alter the existing legal definition of torture, but was codified to ensure that conduct amounting to torture would be punished by no less than life in prison even in situations where the victim survives." (*Ibid*.)

"Section 190.2, subdivision (a)(18) was enacted by initiative in 1978." (*People v. Elliot*, *supra*, 37 Cal.4th at p. 477.) As originally enacted, it required "proof of the infliction of an extremely painful act upon a living victim." (*Ibid*.) "In 1990, the electorate passed Proposition 115, the Crime Victims Justice Reform Act. Proposition 115, among other things, amended section 190.2, subdivision (a)(18) by deleting its language regarding the infliction of extreme physical pain." (*Elliot*, at p. 477.) "Thus, for all homicides committed after June 6, 1990, there is no requirement under the torture-murder special circumstance *that the victim actually suffer pain*. [Citation.] Proposition 115 had no effect, however, upon the basic actus reus required for the special circumstance—that the murder *involve the infliction of torture*." (*People v. Jennings*, *supra*, 50 Cal.4th at p. 676.)

Citing *People v. Elliot*, *supra*, 37 Cal.4th 453, defendant alleges the California Supreme Court "held the electorate's actions," i.e., amending section 190.2, subdivision (a)(18), and creating section 206, "indicated it meant for section 190.2(a)(18) to incorporate section 206's intent element." From this premise he reasons the amended

version of section 190.2, subdivision (a)(18) must have also incorporated section 206's great bodily injury requirement.

Defendant's synopsis of *Elliot* is backwards. The opinion does not say that section 206 was incorporated into section 190.2, subdivision (a)(18). It explains how section 206 "incorporates the same intent element deemed necessary to demonstrate an 'infliction of torture' under section 190.2, subdivision (a)(18) prior to the passage of Proposition 115." (*People v. Elliot*, *supra*, 37 Cal.4th at p. 479.) But "the electorate, in amending section 190.2, subdivision (a)(18), did not mean to change its intent requirement." (*Ibid*.) The case merely holds Proposition 115 did not alter the intent requirement of section 190.2, subdivision (a)(18). (*Elliot*, at pp. 478–479.) The opinion neither states nor implies that section 190.2, subdivision (a)(18) requires a finding of great bodily injury apart from death itself.

Unlike section 206, the torture-murder special circumstance requires a homicide. Since "death is a type of great bodily injury" (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1277), it would be pointless and redundant for the special circumstance instructions to require a finding of great bodily injury. However, even assuming defendant is correct on this point, the claim fails for lack of prejudice.

Defendant overlooks his conviction on count 2 of child assault homicide, which requires an assault "by means of force that to a reasonable person would be likely to produce great bodily injury…." (§ 273ab, subd. (a).) The jury was instructed pursuant to CALCRIM No. 820, which provides the same definition of great bodily injury as used in sections 206 and 12022.7. We have noted defendant's concession regarding his infliction of multiple injuries upon the victim "that clearly did rise to that level." Given the overwhelming evidence of great bodily injury, the jury's proper understanding of the term, and its finding of assault by means likely to produce great bodily injury, its finding on the special circumstance allegation undoubtedly would have been the same had the alleged instructional error not occurred.

24.

## IV. Voluntary Manslaughter

Defendant alleges he was entitled to an instruction on voluntary manslaughter as a lesser included offense of murder. He is mistaken.

"California law requires a trial court, sua sponte, to instruct fully on all lesser necessarily included offenses supported by the evidence." (*People v. Breverman* (1998) 19 Cal.4th 142, 148–149.) "But a court must instruct on such theories only when the record contains ""'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense."'" (*People v. Smith* (2018) 4 Cal.5th 1134, 1163.) Although "we view the evidence in the light most favorable to the defendant" (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137), the substantial evidence requirement "is not satisfied by "'*any* evidence … no matter how weak'"'" (*People v. Avila* (2009) 46 Cal.4th 680, 705).

Voluntary manslaughter is a lesser included offense of murder. (*People v. Rios* (2000) 23 Cal.4th 450, 460.) "Murder involves the unlawful killing of a human being with malice aforethought, but a defendant who intentionally commits an unlawful killing without malice is guilty only of voluntary manslaughter. [Citation.] For purposes of voluntary manslaughter, an intentional unlawful killing can lack malice when the defendant acted under a ""'sudden quarrel or heat of passion'"'" …." (*People v. Blacksher* (2011) 52 Cal.4th 769, 832.)

"A heat of passion theory of manslaughter has both an objective and a subjective component." (*People v. Moye* (2009) 47 Cal.4th 537, 549.) "The '"heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances …."' [Citation.]" (*People v. Avila*, *supra*, 46 Cal.4th at p. 705.) In other words, the test is whether "an average, sober person would be so inflamed that he or she would lose reason and judgment." (*People v. Lee* (1999) 20 Cal.4th 47, 60.) To satisfy the subjective component, a defendant must have acted in the heat of passion because he or she was in fact provoked. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) Both aspects require proof of instigating behavior by the

victim, meaning "the victim must taunt the defendant or otherwise initiate the provocation." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306.)

Defendant argues his homicidal behavior was likely precipitated by the victim's crying. While not acknowledged in his briefing, the argument is based on a version of events he provided during custodial interrogation. However, the prosecutor ultimately elected not to present those statements to the jury. No evidence of crying by the victim was admitted during trial. At most, defendant's exchange of messages with the victim's mother indicated the baby awoke from a nap at some point prior to being killed.

Defendant notes the prosecutor, in closing argument, described him as someone who gets frustrated and angry "when a small child cries." The statement was in reference to the incident involving defendant's newborn daughter. Defendant also contends the prosecutor argued he "violently shook [the victim] as an 'ignorant response to frustration or crying,'" which is not accurate.[4] In any event, "statements by counsel are not evidence." (*People v. Richardson* (2008) 43 Cal.4th 959, 1004.)

Even if it were permissible to assume the baby cried, there was no evidence of how the crying may have constituted adequate provocation—e.g., information regarding the duration of the crying. "'[N]o defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the *facts and circumstances* were sufficient to arouse the passions of the ordinarily reasonable man.'" (*People v. Berry* (1976) 18 Cal.3d 509, 515, italics added.) To the extent public policy would even allow a heat of passion defense in cases of infant homicide, a mere assumption the victim cried before being killed does not alone warrant

---

[4]Defendant relies on the following excerpt from the prosecutor's closing argument: "Think about it. If you're going to shake someone for crying, like most child death cases are, an ignorant response to frustration or crying, and all you want to do is quiet the child down, you stop after the shaking. Why do you need to go further? Why do you need to strangle him? It's because you want to kill him."

an instruction on voluntary manslaughter. Therefore, defendant's claim fails on the merits.

## V.      Defense Counsel's "CPR" Argument

Defendant alleges the trial court erred by limiting certain aspects of the defense closing argument. The claim involves two rulings, both pertaining to the notion defendant may have attempted to perform cardiopulmonary resuscitation (CPR) on the victim. In the first ruling, the trial court sustained an objection to defense counsel saying it was "very likely" such an attempt was made. In the second ruling, the trial court ordered the redaction of a PowerPoint slide that said, "Could CPR have been performed by [defendant][?]" As will be apparent from our summary of the relevant background, any error was harmless.

### A.      Background

The CPR issue traces back to defendant's custodial interrogation on January 3, 2017. He admitted to accidentally killing the victim while trying to stop him from crying. In this version of events, defendant sat on the baby and smothered the baby with a pillow. Further claiming to have made efforts to resuscitate the victim, defendant said, "I gave him CPR for like an hour."

Dr. Carpenter autopsied the victim on January 4, 2017. A corresponding report included a section labeled "Evidence of Medical Intervention," under which he wrote that bruises to the victim's chest area were "all consistent with vigorous CPR-type processes." Defense counsel would later rely on this language to argue defendant attempted to resuscitate the victim, which allegedly undercut the prosecution's theory of first degree murder.

Defendant's custodial statements were not introduced at trial, nor did defendant testify. The jury was thus unaware of his supposed attempts to resuscitate the victim. However, defense counsel made a point of asking witnesses whether they had tried to revive the victim or observed such efforts by others. By all accounts, because the victim

27.

was "obviously deceased" by the time his body was discovered, there were no attempts to render aid. The defense set up an argument that there was evidence of CPR, but neither the mother nor the first responders attempted to revive the victim, so it was inferable defendant had performed CPR.

During cross-examination of Dr. Carpenter, defense counsel asked about the nipple injury: "[A]ren't these fingernail marks sometimes associated with CPR compressions?" Dr. Carpenter replied, "I've never seen fingernail marks at the nipple like in this case associated with chest compressions." He then opined the possibility of the marks being associated with CPR was "remote."

Defense counsel also questioned Dr. Carpenter about the victim's chest injuries being "consistent with vigorous CPR-type processes." The expert confirmed it was possible the injuries were caused by CPR, but he opined the more likely explanation was "other types of blunt force trauma to the chest." On redirect examination, Dr. Carpenter testified he did not believe any of the victim's injuries "came from CPR," but he could not rule out the possibility. He testified the most reasonable explanation for the bruising in question was "blunt force-type injuries such as violent shaking."

In closing argument, defense counsel said, "[I]t's very likely that [defendant] tried to perform CPR on [the victim]." The prosecutor objected, and the trial court excused the jury for a lunch break. Outside the presence of jurors, the prosecutor argued it "assumes facts not in evidence that it's very likely that CPR was performed." Defense counsel summarized the relevant testimony and argued the facts in evidence gave him "every right to argue that CPR may have been performed" on the victim. The prosecutor's response included these statements:

> "First of all, counsel just said it's very likely. Not just likely. Very likely CPR was performed.
>
> "Nowhere in Dr. Carpenter's report or during his testimony did he ever even say it was likely. He said it was a remote possibility. So to get likely and then add an adjective to it of very likely and argue to this jury

28.

that that's reasonable or very likely is zero evidence, supported by absolutely nothing.

> "[Defense counsel] is trying to back-door in, without this defendant testifying, the way he did in his opening statement, that this defendant tried to revive him for an hour."

In a lengthy ruling, the trial court said, "I would categorize what counsel is seeking to argue to the jurors as commenting on hypothetical questions that Dr. Carpenter was asked during his examination." The court found there was "no evidence that anyone conducted or performed CPR on this child." Ultimately, the prosecutor's "motion" was "denied in part and granted in part" for the following reasons:

> "Whether CPR was performed or was not performed and whether a result of vigorous CPR is consistent with the injuries seen in the chest certainly is something that the expert was questioned about and is, for lack of a better phrase, fair game for all counsel to comment on, but to make an inference to inferentially assume that CPR was performed when zero evidence was presented that CPR was ever performed does not allow this jury to determine whether an assumed fact is true based on evidence presented."

When proceedings resumed before the jury, nothing was said to indicate whether the objection had been sustained or overruled. Defense counsel pivoted to a discussion of the self-inflicted injuries observed at the time of defendant's arrest, arguing this was evidence of a suicide attempt. It was further argued the suicide attempt demonstrated remorse and proved "he had no intent to kill."

Defense counsel eventually returned to the topic of CPR and Dr. Carpenter's related testimony. The following argument was presented without objection or interruption:

> "One of the issues was when I discussed the issue of whether there was any evidence of CPR-type processes and I asked him—I reminded him that he had found injury on the surface of the heart in about three different places; that he had written in his report, which he dictated back in 2017, the day he did the autopsy, he dictated it that day, while it was fresh in his mind, he dictated in his words 'all consistent with vigorous CPR-type processes.'

29.

"That's what he put in his report. No one made those words up for him. He put those in his report. A trained doctor, who's done thousands of autopsies and more than 50 on infants, he dictated in his report—he knows how important it is—and he puts that line in his report, that these injuries are consistent with vigorous CPR, cardiopulmonary resuscitation-type processes.

"Now, [the prosecutor] wants you to believe this is just a remote possibility, it's one of many things that are possible, but it's not proven. There's no evidence of it.

"Well, ask yourself if this was a remote possibility, this CPR, that CPR was performed, why would the doctor put it in his report?

"If it was something that was just like oh, one of many possibilities out there, could have been a lot of things, why did he choose to put this in his report specifically when they know this is an official document, an official Sheriff's Department/Coroner document? He signs his name to it. He puts his reputation on it. If it was just something remote, why would he even put it in his report?

"That's not reasonable. That's not a reasonable interpretation of the evidence to say oh, this is just a remote possibility.

"Now, in court he equivocated on this. He kind of went back and forth and said well, it could be consistent with CPR or it could just be other injuries that were inflicted. It's hard to tell. He hasn't really seen anything like this before. It doesn't mean it couldn't happen that way.

"But remember in his report that's what he wrote. He can't get [a]way from that. Why would he put that if it wasn't important to him? Days after—two days after the incident had taken place, the same day that he performed the autopsy, that's what he wrote in the report."

Still later in the defense closing, after counsel had moved on to other arguments, the prosecutor said, "Judge, I'm going to object to a portion in that PowerPoint consistent with our discussion before lunch. I'm going to ask that it be taken down and counsel instructed—" The trial court interrupted the objection and directed the jury to leave the courtroom. Next, outside the presence of jurors, defense counsel made the following statements:

"Your Honor, I assume that she's referring to 'Could CPR have been performed by [defendant].'

30.

"Your Honor, in this particular slide I believe I have the right to argue possibilities, even if they're remote; that based on the nipple injury to [the victim] being on the left side of his chest that it involved some type of attempt to revive him, to wake him up.

"The D.A. can argue it's a remote possibility, but it is a possibility within the evidence. I did not say that it was likely that CPR was performed on him or that there was significant evidence of that, but it does offer some alternative explanation to simply my client pinching or twisting the nipple of the victim."

Citing its ruling on the prior objection, the trial court ordered defense counsel to redact or delete the statement regarding CPR. When the jurors returned to the courtroom, the judge said, "Ladies and gentlemen of the jury, I am going to order that you disregard whatever you observed in [defense counsel's] last slide before we took a recess, and I will remind you that nothing that the attorneys say and nothing that they show you necessarily is evidence in this case unless it is a copy of an exhibit previously marked for identification."

## B.     Law and Analysis

"It is firmly established that a criminal defendant has a constitutional right to have counsel present closing argument to the trier of fact. [Citations.] Nonetheless, it is equally settled that a judge in a criminal case 'must be and is given great latitude in controlling the duration and limiting the scope of closing summations.' [Citations.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184.) A trial court's decision to limit defense counsel's closing argument is reviewed for abuse of discretion. (*People v. Simon* (2016) 1 Cal.5th 98, 147.)

The trial court did not abuse its discretion by prohibiting the defense from arguing it was "very likely" defendant attempted to perform CPR on the victim. "Closing argument presents a legitimate opportunity to 'argue all *reasonable inferences* from evidence in the record.'" (*People v. Bolton* (1979) 23 Cal.3d 208, 212, italics added.) A trial court may prohibit an argument by counsel if there is "no substantial evidence" to support it. (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1388.) Here, the evidence

31.

merely established the *possibility* someone attempted to perform CPR on the victim. The evidence did not permit the inference it was "very likely" or even probable that *anyone* made such an attempt.

Significantly, however, the jury was never informed of the ruling on the prosecutor's initial objection. Defense counsel's "very likely" argument was not ordered stricken, nor was the jury admonished to disregard it. The defense subsequently argued at length about the possibility of someone having attempted CPR. Even if they had ignored the "very likely" statement, reasonably intelligent jurors would have understood defense counsel had no reason to belabor the point unless it was relevant to the charges. The obvious subtext was that *defendant* may have attempted to perform CPR on the victim.[5]

On appeal, defendant continues to argue the CPR theory was important to show his remorse and lack of intent to kill. His apparent suicide attempt, about which defense counsel argued extensively, was far more compelling and probative of those mental states. The CPR theory was objectively weaker and more difficult to reconcile with the vicious beating and strangulation. The jury was aware defendant had a functioning cell phone but did not call 911 or otherwise seek aid for the victim.

Given the circumstances, defendant's claim boils down to whether the trial court erred by ordering redaction of the words, "Could CPR have been performed by [defendant?]" As noted in his briefing, a defense attorney "'''''has the right to state fully his views as to what the evidence shows, and as to the conclusions to be fairly drawn therefrom.'''''" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 795.) Although some

_____

[5]The prosecutor had already emphasized, in her own closing argument, the lack of evidence anyone else might have performed CPR: "Counsel, I expect, will argue to you when I'm finished about some of the cross-examination he talked to Dr. Carpenter about yesterday about CPR. [¶] … [¶] First of all, there is zero evidence anyone ever gave this little boy CPR. You heard from the two initial responding officers from the Tehachapi Police Department. Neither of them gave CPR. He was already dead. They felt for a pulse. There was already lividity setting in. You have no evidence any doctors ever gave CPR. There is nothing to support a conclusion that [the victim] was attempted to be revived, nothing."

limitations were imposed, the CPR theory was fully conveyed to the jury. (Cf. *People v. Simon*, *supra*, 1 Cal.5th at p. 149 [no constitutional violation where limitation on closing argument did not preclude counsel "from making his central argument"]; *People v. Marshall* (1996) 13 Cal.4th 799, 854 ["The court's ruling fell within its discretion to control the scope of closing argument and did not preclude defendant from making his central point"].) For the reasons discussed, we conclude the alleged error was harmless beyond a reasonable doubt.

## VI.   Cumulative Error

In his final challenge to the convictions, defendant argues cumulative error. Under the cumulative error doctrine, "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844; accord, *People v. Capers* (2019) 7 Cal.5th 989, 1017.) Giving due consideration to the collective impact of any error in admitting Dr. Carpenter's "deliberate killing" testimony, limiting the defense closing, and the alleged defects in CALCRIM No. 733, we reject defendant's claim.

## VII.   Sentencing Issues

### A.   Parole Revocation Fine

The trial court imposed a parole revocation fine pursuant to section 1202.45. Defendant claims this was improper, and the People agree. The parties are correct. Section 1202.45 is not applicable unless the sentence includes a determinate prison term. (*People v. Mclnnis* (2021) 63 Cal.App.5th 853, 866–867; see *People v. Baker* (2021) 10 Cal.5th 1044, 1108 [parole revocation fine held applicable despite death sentence "because defendant was also sentenced to a determinate term"].) The fine will be stricken from the judgment.

### B.   Section 654

On October 2, 2020, defendant was sentenced to LWOP pursuant to section 190.2, subdivision (a)(18). For the subordinate offense of child assault homicide (§ 273ab,

subd. (a)), the trial court imposed a sentence of 25 years to life but stayed it pursuant to section 654. At the time, section 654 provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Stats. 1997, ch. 410, § 1.)

Section 654 was later amended by Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518). Effective January 1, 2022, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a), italics added; Stats. 2021, ch. 441, § 1.)

Defendant claims the amendment to section 654 is retroactive. Because his sentence on count 2 was stayed pursuant to (former) section 654, he contends the new law makes it possible for him to avoid LWOP and he seeks to have the matter remanded for a new sentencing hearing. The People partially concede this claim but oppose a remand.

"When the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted; accord, *In re Estrada* (1965) 63 Cal.2d 740, 745.) Section 654 does not reduce the punishment for a particular crime, but the California Supreme Court has "applied the *Estrada* rule to statutes that merely made a reduced punishment possible." (*People v. Frahs* (2020) 9 Cal.5th 618, 629; see, e.g., *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308 [extending the *Estrada* rule to legislation that "ameliorated the possible punishment for a class of persons"].) "[I]n order to rebut *Estrada*'s inference of retroactivity concerning ameliorative statutes, the Legislature must 'demonstrate its

34.

intention with sufficient clarity that a reviewing court can discern and effectuate it.'"
(*Frahs*, at p. 634.)

Because the amendment to section 654 potentially confers ameliorative benefits to defendants convicted of multiple offenses based on the same act or course of conduct, the criteria for retroactive application is satisfied. Neither the text of the statute nor the legislative history of Assembly Bill 518 "clearly signal" the intent of "prospective-only application." (*People v. Frahs*, *supra*, 9 Cal.5th at pp. 631–632.) Therefore, we conclude the amendment applies retroactively to nonfinal cases such as this one. (Accord, *People v. Sek* (2022) 74 Cal.App.5th 657, 673.)

"'[T]he appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion "even if it had been aware that it had [discretion to impose a different sentence]."'" (*People v. Flores* (2020) 9 Cal.5th 371, 432.) Both parties rely on the following statements by the trial court at the time of sentencing:

> "In this particular case everyone is aware of the sentence that is going to be presented and in my view this sentence is appropriate for the crime that was committed by [defendant] and the Court will follow by operation of law the mandatory sentence. Even if this was not the mandatory sentence but it was a viable sentence, it was one that this court would strongly consider given the overall circumstances of this case."

According to the People, the quoted statements demonstrate "there is no possibility" the trial court would impose a different sentence on remand. Defendant argues the statements are not conclusive, and "it cannot be said what the trial court would do when afforded actual discretion and [presented] with a defense argument for some leniency." We agree with defendant insofar as this is not a case where the record "demonstrates with unusual clarity that remand would be an idle act." (*People v. Flores*, *supra*, 9 Cal.5th at p. 432; see *ibid.* [remand unnecessary where trial court had said appellant was among "'the worst of the worst offenders'" and "'deserving'" of the death penalty].)

35.

## DISPOSITION

The parole revocation fine imposed pursuant to section 1202.45 is stricken from the judgment. The cause is remanded for a new sentencing hearing in light of Assembly Bill 518. In all other respects, the judgment is affirmed.

PEÑA, Acting P. J.

WE CONCUR:


MEEHAN, J.


SNAUFFER, J.